Barry I. Levy, Esq.
Michael Vanunu, Esq.
Philip P. Nash, Esq.
Ashley N. Prinz, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and          Docket No.:_____ (      )
 GEICO CASUALTY COMPANY,

                               Plaintiffs,

                                                              **Plaintiff Demands a Trial by Jury**

            -against-

ALPINE MED, INC., TETIANA PIROZHENKO,
GGR DME, INC., DANYLO HALCHYNSKYI, HGY
SUPPLY, INC., ANDRII PIVEN, LENSE SUPPLY,
INC., MARIANA MARTNIUK, MAZOL SUPPLY,
INC., OLEG KHARITONOV, POLLY SUPPLY, INC.,
ALINA BERDAR, and JOHN DOE DEFENDANTS "1"
– "10",

                               Defendants.
------------------------------------------------------------------X

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Alpine Med, Inc., Tetiana Pirozhenko, GGR DME,

Inc., Danylo Halchysnkyi, HGY Supply, Inc., Andrii Piven, Lense Supply, Inc., Mariana Martniuk,

Mazol Supply, Inc., Oleg Kharitonov, Polly Supply, Inc., Alina Berdar (collectively, the

1

"Defendants"), and John Doe Defendants "1" through "10" (the "John Doe Defendants"), hereby allege as follows:

## INTRODUCTION

1.      GEICO brings this action to recover more than $1 million that Defendants have wrongfully obtained from GEICO by submitting and causing to be submitted hundreds of fraudulent No-Fault insurance claims for medically unnecessary, illusory, and otherwise non-reimbursable durable medical equipment ("DME") and orthotic devices ("OD") (e.g., cervical collars, lumbar sacral supports, orthopedic cars seats, massagers, bed boards, egg crate mattresses, etc.) (collectively, the "Fraudulent Equipment") through a series of purported DME providers known as Alpine Med, Inc. ("Alpine Supply"), GGR DME, Inc. ("GGR Supply"), HGY Supply, Inc. ("HGY Supply"), Lense Supply, Inc. ("Lense Supply"), Mazol Supply, Inc. ("Mazol Supply") and Polly Supply, Inc. ("Polly Supply") (collectively, the "DME Entities").

2.      The DME Entities are all New York corporations that have, in a consecutive manner, dispensed DME and OD to individuals who were allegedly involved and injured in automobile accidents and were entitled for coverage under No-Fault insurance policies issued by GEICO ("Insureds") as part of a "quick-hit" insurance fraud scheme to submit a large volume of billing to GEICO and other New York automobile insurance companies for Fraudulent Equipment.

3.      While the DME Entities are owned on paper by Tetiana Pirozhenko ("Pirozhenko"), Danylo Halchynskyi ("Halchynskyi"), Andrii Piven ("Piven"), Mariana Martniuk ("Martniuk"), Oleg Kharitonov ("Kharitonov"), and Alina Berdar ("Berdar") (collectively, the "Paper Owner Defendants"), at all times they were actually operated and controlled by others not presently identifiable to GEICO.

4.      The Defendants, in conjunction with others not presently identifiable to GEICO,

devised a fraudulent scheme that involved: (i) associating and colluding with the layperson operators and managers (the "Clinic Controllers") of various No-Fault medical clinics (the "Clinics"); (ii) obtaining prescriptions through the payment of kickbacks and other financial incentives for medically unnecessary DME/OD purportedly issued by healthcare providers (the "Referring Providers") who were working out of Clinics in the New York metropolitan area; and (iii) using these prescriptions for medically unnecessary DME/OD to submit billing to GEICO and the New York automobile industry with each DME Entity making common fraudulent misrepresentations regarding the type and nature of the Fraudulent Equipment in order to inflate the charges to GEICO and maximize the Defendants' ill-gotten gains. Through the fraudulent scheme, the Defendants billed GEICO alone for more than $2.1 million.

5.       As part of their fraudulent scheme to extract money from GEICO, and avoid detection, the Defendants shifted the billing submitted to GEICO from one DME Entity to the next from January 2024 through June 2025 and continue to seek collections on the fraudulent billing through today.

6.       Through this action, GEICO seeks to recover more than $1 million that has been wrongfully obtained by Defendants and further seeks a declaration that it is not legally obligated to pay reimbursement of more than $420,000.00 in pending No-Fault insurance claims that have been submitted by or on behalf of the DME Entities since 2024 because:

      (i)      The Defendants billed GEICO for Fraudulent Equipment pursuant to a fraudulent scheme that was designed and implemented to exploit Insureds for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care, and which included dispensing Fraudulent Equipment that was not medically necessary and which was prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements;

      (ii)     The Defendants billed GEICO for Fraudulent Equipment that was provided

– to the extent any Fraudulent Equipment was provided at all – as a result of decisions that were made by laypersons, not based upon prescriptions issued by the Referring Providers who are licensed to issue such prescriptions;

(iii)   To the extent that any Fraudulent Equipment was provided to Insureds, the bills for the Fraudulent Equipment submitted to GEICO by the Defendants fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to the Insureds in order to fraudulently inflate the reimbursement rate for the Fraudulent Equipment, as the Healthcare Common Procedure Coding System ("HCPCS") Codes identified in the bills did not accurately represent what was provided to Insureds;

(iv)   To the extent that any Fraudulent Equipment was provided to Insureds, the bills for the Fraudulent Equipment submitted to GEICO by the Defendants fraudulently and grossly inflated the permissible reimbursement rate that the Defendants could have received for the Fraudulent Equipment; and

(v)   The Defendants billed GEICO for Fraudulent Equipment when they were not entitled to collect No-Fault Benefits because they failed to comply with local licensing requirements.

7.    The Defendants fall into the following categories:

(i)   The DME Entities are New York corporations that are used as the billing arm of the fraudulent scheme – they purport to provide Fraudulent Equipment to persons who were allegedly injured in motor vehicle accidents, and bill New York automobile insurance companies, including GEICO;

(ii)   The Paper Owner Defendants are the primary drivers of the fraudulent scheme – they are listed on paper as the owners, operators and controllers of the DME Entities, when, as discussed in greater detail below, the Paper Owner Defendants work for one of the John Doe Defendants who secretly operated, managed, controlled, and financially benefited from the DME Entities and used the DME Entities to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims; and

(iii)   The John Doe Defendants are the other individuals involved in the fraudulent scheme – while they are presently not identifiable, they include the person(s) secretly controlling and profiting from the DME Entities and the Clinic Controllers who are associated with the Clinics, and have colluded with the Defendants to further drive and financially benefit from the common fraudulent scheme committed against GEICO and other New

York automobile insurers through their associations with the Referring Providers and control of the Clinics.

8.      As discussed below, the Defendants have always known that the claims for Fraudulent Equipment submitted to GEICO were fraudulent because: (i) the billing submitted to GEICO and other New York automobile insurers was pursuant to a fraudulent scheme that was designed and implemented to exploit Insureds for financial gain so as to benefit the Defendants and others not presently known (i.e., the John Doe Defendants), without regard for genuine patient care, and which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements; (ii) the Fraudulent Equipment was provided as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions; (iii) the bills fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to the Insureds; (iv) the charges were intentionally inflated based upon an exploitation of the payment formulas set forth in New York's "No-Fault" laws; and (v) the bills for Fraudulent Equipment submitted by the Defendants to GEICO through the DME Entities, fraudulently misrepresented that the Defendants complied with all local licensing requirements when the Defendants were not lawfully licensed to provide the Fraudulent Equipment by the New York City Department of Consumer and Worker Protection (formerly Department of Consumer Affairs), as they either misrepresented the ownership interest for each of the DME Entities or failed to obtain a license prior to submitting bills to GEICO.

9.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through the DME Entities.

10.     The charts annexed hereto as Exhibits "1" through "6" set forth a representative sample of the fraudulent claims that have been identified to date that the Defendants submitted, or

caused to be submitted, to GEICO in the name of the DME Entities.

11.    The Defendants fraudulent scheme against GEICO and the New York automobile insurance industry began in January 2024 and has continued uninterrupted through the present day, as the Defendants continue to seek collection from GEICO on pending charges for Fraudulent Equipment.

12.    As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $1 million, which represents payments voluntarily made by GEICO based on the representations contained in the billing submitted by the Defendants.

## THE PARTIES

### I.    Plaintiffs

13.    Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

### II.    Defendants

14.    John Doe Defendant "1" (hereinafter, the "Secret Owner") is presently not identifiable, but is secretly controlling and profiting from the DME Entities, and has conspired and colluded with the Defendants and others, who are not presently identifiable, at various Clinics to obtain prescriptions for medically unnecessary Fraudulent Equipment  purportedly issued by the Referring Providers which were used by the Defendants as the basis to submit bills to GEICO, and other New York automobile insurers, seeking payment for the Fraudulent Equipment.

15.    Defendant Alpine Supply is a New York corporation with its principal place of

6

business in Kings County, New York. Alpine Supply was incorporated on March 7, 2024, and is owned on paper and purportedly operated and controlled by Pirozhenko. In actuality, the Secret Owner operates, manages, controls, and profits from Alpine Supply, and, with the aid of Pirozhenko used Alpine Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

16.     Defendant Pirozhenko resides in and is a citizen of Massachusetts and is listed as the "paper" owner of Alpine Supply. Pirozhenko is not and has never been a licensed healthcare provider. Pirozhenko, at all relevant times, has been one of the primary drivers of the fraudulent scheme, as she participated in a scheme with the Secret Owner purporting to own, operate, and control Alpine Supply, associated with others who are not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to GEICO and other New York automobile insurance companies for the Fraudulent Equipment.

17.     Defendant GGR Supply is a New York corporation with its principal place of business in Queens County, New York. GGR Supply was incorporated on December 20, 2024, and is owned on paper, and purportedly operated and controlled by Halchynskyi. In actuality, the Secret Owner operates, manages, controls, and profits from GGR Supply, and, with the aid of Halchynskyi, used GGR Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

18.     Defendant Halchynskyi resides in and is a citizen of Florida and is listed as the "paper" owner of GGR Supply. Halchynskyi is not and has never been a licensed healthcare provider. Halchynskyi, at all relevant times, has been one of the primary drivers of the fraudulent scheme, as he participated in a scheme with the Secret Owner purporting to own, operate, and

control GGR Supply, associated with others who are not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to GEICO and other New York automobile insurance companies for the Fraudulent Equipment.

19.     Defendant HGY Supply is a New York corporation with its principal place of business in Kings County, New York. HGY Supply was incorporated on November 7, 2024, and is owned on paper, and purportedly operated and controlled by Piven. In actuality, the Secret Owner operates, manages, controls, and profits from HGY Supply, and with the aid of Piven, used HGY Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

20.     Defendant Piven resides in and is a citizen of Ohio and is listed as the "paper" owner of HGY Supply. Piven is not and has never been a licensed healthcare provider. Piven, at all relevant times, has been one of the primary drivers of the fraudulent scheme, as he participated in a scheme with the Secret Owner purporting to own, operate, and control HGY Supply, associated with others who are not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to GEICO and other New York automobile insurance companies for the Fraudulent Equipment.

21.     Defendant Lense Supply is a New York corporation with its principal place of business in Kings County, New York. Lense Supply was incorporated on April 9, 2024, and is owned on paper, and purportedly operated and controlled by Martniuk. In actuality, the Secret Owner operates, manages, controls, and profits from Lense Supply, and with the aid of Martniuk, used Lense Supply as a vehicle to submit fraudulent billing to GEICO and other New York

automobile insurers.

22.     Defendant Martniuk resides in and is a citizen of New York and is listed as the "paper" owner of Lense Supply. Martniuk is not and has never been a licensed healthcare provider. Martiniuk, at all relevant times, has been one of the primary drivers of the fraudulent scheme, as she participated in a scheme with the Secret Owner purporting to own, operate, and control Lense Supply, associated with others who are not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to GEICO and other New York automobile insurance companies for the Fraudulent Equipment.

23.     Defendant Mazol Supply is a New York corporation with its principal place of business in Nassau County, New York. Mazol Supply was incorporated on September 23, 2024, and is owned on paper, and purportedly operated and controlled by Kharitonov. In actuality, the Secret Owner operates, manages, controls, and profits from Mazol Supply, and with the aid of Kharitonov, used Mazol Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

24.     Defendant Kharitonov resides in and is a citizen of New York and is listed as the "paper" owner of Mazol Supply. Kharitonov is not and has never been a licensed healthcare provider. Kharitonov, at all relevant times, has been one of the primary drivers of the fraudulent scheme, as he participated in a scheme with the Secret Owner purporting to own, operate, and control Mazol Supply, associated with others who are not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to GEICO and other New York automobile insurance companies for the Fraudulent Equipment.

25.    Defendant Polly Supply is a New York corporation with its principal place of business in Kings County, New York. Polly Supply was incorporated on August 2, 2024, and is owned on paper, and purportedly operated and controlled by Berdar. In actuality, the Secret Owner operates, manages, controls, and profits from Polly Supply, and with the aid of Berdar, used Polly Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

26.    Defendant Berdar resides in and is a citizen of New Jersey and is listed as the "paper" owner of Polly Supply. Berdar is not and has never been a licensed healthcare provider. Berdar, at all relevant times, has been one of the primary drivers of the fraudulent scheme, as she participated in a scheme with the Secret Owner purporting to own, operate, and control Polly Supply, associated with others who are not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to GEICO and other New York automobile insurance companies for the Fraudulent Equipment.

27.    The John Doe Defendants are individuals who are not presently identifiable and include the Clinic Controllers associated with the Clinics, who are not licensed healthcare professionals but who unlawfully own and control the Clinics and the relationships with the Referring Providers, and who have conspired with the Defendants and Secret Owner to further the fraudulent scheme committed against GEICO and other New York automobile insurers for their own economic benefit.

## JURISDICTION AND VENUE

28.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive

of interest and costs, and is between citizens of different states.

29.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

30.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred and is the District where one or more of the Defendants reside.

## ALLEGATIONS COMMON TO ALL CLAIMS

31.     GEICO underwrites automobile insurance in the State of New York.

## I.     An Overview of the Pertinent Laws

### A.     Pertinent Laws Governing No-Fault Insurance Reimbursement

32.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

33.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

34.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD. See N.Y. Ins. Law § 5102(a).

35.    In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

36.    Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

37.    Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

38.    In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

39.    Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

40.    Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty

of a criminal act punishable under law and may be subject to civil penalties.

**B.    Pertinent Statutes and Regulations Relating to No-Fault Benefits, DME and OD**

41.    Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME or OD that was provided pursuant to a lawful prescription from a license healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME or OD that was provided without a prescription, pursuant to an unlawful prescription, or by reason of a decision of a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

42.    Under New York State's Public Health Law, "a practitioner may not make a referral to a health care provider for the furnishing of any health or health related items or services where such practitioner . . . has any of the following financial relationships without disclosing to the patient such financial relationship: . . . (b) a compensation arrangement." See N.Y. P.H.L. § 238-d(1). A practitioner is defined to include "a licensed or registered physician, dentist, podiatrist, chiropractor, nurse, midwife, physician assistant or specialist assistant, physical therapist, or optometrist." See N.Y. P.H.L. § 238(11).

43.    A health care provider is defined to include "a purveyor of health or health related supplies, appliances or equipment", which are DME suppliers such as the DME Entities. See N.Y. P.H.L. § 238(6). A compensation arrangement, as referenced in N.Y. P.H.L. § 238-d, includes any remuneration, whether directly, indirectly, overly, covertly, in cash, or in kind that is between a practitioner and a health care provider. See N.Y. P.H.L. § 238-a(5)(a).

44.    DME generally consists of items that can withstand repeated use and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electrical muscle

stimulator units, infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), cervical traction units, whirlpool baths, and the Fraudulent Equipment purportedly dispensed by the DME Entities.

45.     OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of the spine, joints, or limbs. These devices come in direct contact with the outside of the body, and include such items as cervical collars (i.e., "whiplash" collars), lumbar supports, knee supports, ankle supports, and the like.

46.     Title 20 of the City of New York Administrative Code imposes licensing requirements on healthcare providers located within the City of New York which engage in a business which substantially involves the selling, renting, repairing, or adjusting of products for the disabled, which includes DME and OD.

47.     Specifically, New York City's Administrative Code requires DME/OD suppliers to obtain a Dealer in Products for the Disabled License ("Dealer in Products License") issued by the New York City Department of Consumer and Worker Protection, formerly Department of Consumer Affairs, ("DCWP") in order to lawfully provide DME or OD to the disabled, which is defined as "a person who has physical or medical impairment resulting from anatomical or physiological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques." See 6 RCNY § 2-271; NYC Admin. Code §20-425.

48.     It is unlawful for any DME/OD supplier to engage in the selling, renting, fitting, or adjusting of products for the disabled within the City of New York without a Dealer in Products License. See NYC Admin. Code §20-426.

49.     A Dealer in Products License is obtained by filing a license application with the DCWP. The application requires that the applicant identify, among other pertinent information, the commercial address of where the DME/OD supplier is physically operating from.

50.     The license application for a Dealer in Products License also requires the applicant to affirm that they are authorized to complete and submit the application on behalf of the corporate entity seeking a license and that the information contained in the application is true, correct, and complete. The affirmation associated with the application requires a signature that is made under penalty for false statements under Sections 175.30, 175.35, and 210.45 of New York's Penal Law.

51.     To ensure that each Insured's $50,000.00 in maximum No-Fault Benefits is not artificially depleted by inflated DME charges, the maximum charges that may be submitted by healthcare providers for DME and OD are set forth in the New York Fee Schedule.

52.     In a June 16, 2004, Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment" the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME and OD charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

53.     As it relates to DME and OD, the New York State Workers' Compensation Board adopted to New York State Workers' Compensation Durable Medical Equipment Fee Schedule ("Fee Schedule") that became effective on April 4, 2022.

54.     Among other things, the Fee Schedule limited the reimbursement rates of certain previously abused DME charges and established a maximum permissible charge for certain specifically listed pieces of DME ("Fee Schedule items"). The charges for the reimbursement of

DME by the New York State Workers' Compensation Board are reflected in 12 N.Y.C.R.R. § 442.2 (2022).

55.    Similarly, effective June 1, 2023, the New York State Department of Financial Services issued an amendment to 11 N.Y.C.R.R. 68, adding Part E of Appendix 17-C, to address No-Fault reimbursement for DME that is not specifically identified by the Fee Schedule ("Non-Fee Schedule item").

56.    For Non-Fee Schedule items that are provided by a DME/OD supplier, the maximum permissible reimbursement rate is the lesser of: (1) the acquisition cost (i.e., the line item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public. See 11 N.Y.C.R.R. 68, Appendix 17-C, Part E.

57.    For Fee Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS") was tasked with analyzing and assigning HCPCS Codes that should be used by DME and OD companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME or OD must meet in order to qualify for reimbursement under a specific HCPCS Code.

58.    For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona-fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See New York State

16

Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004, Opinion Letter.

59.     Additionally, many HCPCS Codes relate to OD that has either been prefabricated, custom-fitted, and/or customized. Palmetto published a guide to differentiating between custom-fitted items and off-the-shelf, prefabricated items, entitled <u>Correct Coding – Definitions Used for Off-the Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised</u>. As part of its coding guide, Palmetto has identified who is qualified to properly provide custom-fitted OD.

60.     Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i)     The provider is in compliance with all significant statutory and regulatory requirements;

(ii)    The provider received a legitimate prescription that was issued in accordance with the requirements of applicable laws and is for reasonable and medically necessary DME or OD from a healthcare practitioner that is licensed to issue such prescriptions;

(iii)   The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription;

(iv)    The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient; and

(v)     The fee sought for DME or OD provided to an Insured was not in excess of the price contained in the Fee Schedule or the standard used for a Non-Fee Schedule item.

## II.    The Defendants' Fraudulent Scheme

### A.    The DME Entities' Common Secret Ownership

61.     The Secret Owner, Paper Owner Defendants, and John Doe Defendants conspired to design and implement a complex insurance fraud scheme in which the DME Entities were used

consecutively and in conjunction with each other between January 2024 and June 2025 to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits to which they were never entitled to receive.

62.    While each of the DME Entities were formed and listed as being independently owned by one of the Paper Owner Defendants, all of the DME Entities were actually controlled by the Secret Owner, who also profited from the fraudulent scheme committed against GEICO and other New York automobile insurers.

63.    The Secret Owner was able to secretly control and profit from the DME Entities by using each of the Paper Owner Defendants as "straw" owners who would place their name on documents that needed to be filed with the State of New York and City of New York in order to lawfully operate the DME Entities.

64.    In keeping with the fact that the Secret Owner actually owned, controlled, and profited from the DME Entities, and used the Paper Owner Defendants to further the fraudulent scheme herein, there is significant overlap in the operations of the various DME Entities that could only exist through the Secret Owner's involvement.

65.    For example, the Secret Owner, together with the Paper Owner Defendants, operated the DME Entities in the following concurrent and sequential fashion, as part of a "quick hit" strategy so as to limit the amount of billing submitted from any one of the DME Entities and mask the common fraudulent scheme:

      (i)      Alpine Supply billed GEICO for dates of service between January 29, 2024, and June 2, 2025;

      (ii)     Lense Supply billed GEICO for dates of service between March 14, 2024, and August 6, 2024;

      (iii)    Polly Supply billed GEICO for dates of service between July 2, 2024, and December 17, 2024;

(iv)    Mazol Supply billed GEICO for dates of service between September 10, 2024, and December 26, 2024;

(v)    HGY Supply billed GEICO for dates of service between November 7, 2024, and January 27, 2025; and

(vi)    GGR Supply billed GEICO for dates of service between February 10, 2025, and May 20, 2025.

66.    In keeping with the fact that the DME Entities are actually controlled by the Secret Owner, and were operated as part of a common scheme, each of the DME Entities used the same two virtually identical template delivery receipts in their supporting documentation to GEICO. For example:

<u>Delivery Receipt Version "1"</u>



67. Additionally, when a different set of DME was purportedly supplied by the DME Entities, all of the DME Entities had another identical template delivery receipt that they used. For example:

<u>Delivery Receipt Version "2"</u>





## Mazol Supply

## Polly Supply

## Alpine Supply

## GGR Supply

68.     Relatedly, and as part of the common scheme, based on collusive arrangements between the Secret Owner, the Paper Owner Defendants, Clinic Controllers and other John Doe Defendants, the DME Entities would receive virtually identical prescriptions for Fraudulent Equipment from Clinics in the New York metropolitan area, including from the Clinics located at: (i) 3250 Westchester Avenue, Bronx, New York; (ii) 540 East Fordham Road, Bronx, New York; (iii) 100 Pennsylvania Avenue, Brooklyn, New York; and (iv) 5000 Broadway, New York, New York.

69.     As part of the Secret Owner's control over the DME Entities, each of the six purportedly separately owned DME Entities utilized the same collections attorney.

70.     Further, as part of the Defendants' efforts to mask the Secret Owner's operation and control of the DME Entities, GEICO attempted to verify the claims submitted by the Defendants by way of requesting examinations under oath, however, the Paper Owner Defendants intentionally refused to appear and provide testimony and/or documents because they would have been unable to answer key questions about the DME Entities' operations and their testimony would have revealed the fraudulent scheme and the secret ownership behind that scheme.

71.     Additionally, and as discussed further below, in response to receiving virtually identical prescriptions for Fraudulent Equipment, each of the DME Entities billed GEICO using virtually identical HCPCS Codes, and the DME Entities each made virtually identical coding misrepresentations and reimbursement misrepresentations in their billing to GEICO.

**B.     Overview of the Defendants' Fraudulent Scheme**

72.     Beginning in January 2024, the Defendants devised and implemented a complex fraudulent insurance scheme in which the DME Entities were used as vehicles to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits to which the

Defendants were never entitled to receive.

73.     To maximize the amount of No-Fault Benefits that the Defendants could receive, the Secret Owner along with the Paper Owner Defendants, used the DME Entities in sequential and overlapping fashion to divide the billing that they were submitting to No-Fault insurance carriers including GEICO.

74.     In keeping with the fact that the Defendants split up their billing in order to maximize the amount of No-Fault Benefits they could collect, the DME Entities operated in sequential order, typically with some overlap to allow more than one entity to bill No-Fault insurance carriers, including GEICO, at a single time.

75.     Through the complex multi-corporation scheme, the Secret Owner and the Paper Owner Defendants used the DME Entities to bill and collect No-Fault Benefits from GEICO and other automobile insurers that they were never entitled to collect. Specifically:

(i)     Between January 29, 2024, and June 2, 2025, Alpine Supply submitted more than $405,000.000 in fraudulent claims to GEICO, has wrongfully obtained more than $80,000.00, and there is more than $228,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of, from GEICO;

(ii)    Between March 14, 2024, and August 6, 2024, Lense Supply submitted more than $395,000.000 in fraudulent claims to GEICO, has wrongfully obtained more than $205,000.00, and there is more than $125,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of, from GEICO;

(iii)   Between July 2, 2024, and December 17, 2024, Polly Supply submitted more than $330,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $250,000.00, and there is more than $25,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of, from GEICO;

(iv)    Between September 10, 2024, and December 26, 2024, Mazol Supply submitted more than $365,000.000 in fraudulent claims to GEICO, has wrongfully obtained more than $270,000.00, and there is more than

$95,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of, from GEICO;

(v)     Between November 7, 2024, and January 27, 2025, HGY Supply submitted more than $250,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $120,000.00, and there is more than $75,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of, from GEICO; and

(vi)    Between February 10, 2025, and May 20, 2025, GGR Supply submitted more than $415,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $280,000.00, and there is more than $135,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of, from GEICO.

76.     The Defendants were able to perpetuate the fraudulent scheme against GEICO described below by obtaining illegitimate prescriptions for the Fraudulent Equipment purportedly issued by the Referring Providers because of collusive agreements with the Clinic Controllers and other John Doe Defendants who are associated with the Clinics.

77.     Notably, none of the Defendants marketed or advertised the DME Entities to the general public, and the DME Entities lacked any genuine retail or office location and operated without any legitimate efforts to attract patients who might need DME and/or OD or healthcare practitioners who might legitimate prescribe DME and/or OD.

78.     Similarly, the Paper Owner Defendants did virtually nothing that would be expected of the owner of a legitimate DME supply company to develop its reputation in the medical community or to attract patients who might need DME and/or OD or healthcare practitioners who might legitimately prescribe DME and/or OD.

79.     Instead, the Defendants entered into collusive agreements with the John Doe Defendants who were associated with both the Clinics and the Referring Providers whereby kickbacks and other financial incentives were paid so that the DME Entities would receive large volumes of prescriptions from the Referring Providers in relation to the Insureds who were being

treated at the Clinics.

80.    Further, the Defendants intentionally targeted the Fraudulent Equipment that they dispensed, so that they could submit inflated claims for reimbursement from GEICO.

81.    As part of the fraudulent scheme, and in a way to maximize the amount of money that the Defendants could obtain from GEICO and other automobile insurers, the Defendants regularly misrepresented multiple types of DME/OD they purportedly dispensed to Insureds in their billing to GEICO.

82.    The prescriptions obtained by the Defendants for Fraudulent Equipment were never given to the Insureds to fill, but as part of the fraudulent scheme, they were routed directly to the Defendants at the direction of the Clinic Controllers to ensure that the Insureds did not attempt to fill the prescriptions with legitimate DME and OD retailers, who would likely question the legitimacy of the prescriptions, the volume of prescriptions, or the need for the DME/OD in the first instance.

83.    The prescriptions obtained by the Defendants for Fraudulent Equipment included prescriptions for both Fee Schedule and Non-Fee Schedule items which the Defendants used: (i) as a basis to purportedly provide and bill for whatever DME/OD the Defendants decided to dispense, not what was determined based upon legitimate prescriptions by a licensed healthcare professional; (ii) to misrepresent the nature and quality of the items that they actually dispensed, so as to claim entitlement to a higher fee payable by automobile insurers like GEICO; and (iii) to misrepresent the maximum reimbursement rate they were entitled to receive for Non-Fee Schedule items.

84.    As part of the scheme, the Clinic Controllers directed that the prescriptions issued by the Referring Providers should often be written in a generic, vague, non-descript manner so that

the DME Entities could have the flexibility to designate the products that would result in the highest forms of reimbursement from GEICO.

85.     The Defendants then used the intentionally generic and vague prescriptions to unlawfully choose one of many variations of DME and/or OD that could be provided to the Insureds. As a result, in virtually every circumstance available, the Defendants purported to provide the Insureds with a variation that had high – if not one of the highest – maximum reimbursement rates under the applicable fee schedule.

86.     In addition to unlawfully choosing specific types of Fraudulent Equipment to provide Insureds, each of the DME Entities engaged in a virtually identical pattern of submitting bills to GEICO seeking No-Fault Benefits based on HCPCS Codes that did not accurately represent – sometimes in any way – the Fraudulent Equipment purportedly provided to the Insureds in order to obtain higher reimbursement rates than what was permissible.

87.     By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, the DME Entities represented that they provided Insureds with the particular items associated with each unique HCPCS Code, and that such specific item was medically necessary as determined by a healthcare provider licensed to prescribe DME and/or OD.

88.     However, to the extent that any Fraudulent Equipment was actually provided to Insureds, the Fraudulent Equipment did not match the HCPCS Codes identified in the bills submitted by the DME Entities.

89.     Instead, to the extent that any Fraudulent Equipment was provided to the Insureds, the Defendants provided Insureds with inexpensive and poor-quality Fraudulent Equipment, which did not contain all the features required by the HCPCS Codes identified in the bills submitted by the DME Entities.

90.    The Fraudulent Equipment actually provided to Insureds – again to the extent that any Fraudulent Equipment was actually provided – were inexpensive and poor-quality items that only qualified under HCPCS Codes with significantly lower maximum reimbursement rates than the HCPCS Codes actually identified in the bills submitted by the Defendants.

91.    In furtherance of their scheme to defraud GEICO and other automobile insurers, the Defendants also submitted bills for Non-Fee Schedule items that falsely indicated that they were seeking reimbursement at the <u>lesser</u> of 150% of the Defendants' legitimate acquisition cost or the cost to the general public for the same item.

92.    In actuality, the bills from the Defendants submitted to GEICO for Non-Fee Schedule items contained grossly inflated reimbursement rates that did not accurately represent the lesser of 150% of the Defendants' legitimate acquisition cost or the cost to the general public.

93.    As a further part of this scheme, Defendants submitted bills to GEICO with reimbursement rates that indicated the Non-Fee Schedule items purportedly provided to Insureds were expensive and high-quality, when the Fraudulent Equipment provided was cheap and poor-quality, and was purchased from wholesalers for a small fraction of the reimbursement rates contained in the bills.

94.    In fact, the cheap and poor-quality Fraudulent Equipment provided to the Insureds – again, to the extent that any Fraudulent Equipment was actually provided – were easily obtainable from legitimate internet or brick-and-mortar retailers for a small fraction of the reimbursement rates identified in the bills submitted to GEICO by the Defendants.

95.    Each of the DME Entities made virtually identical fraudulent misrepresentations in the HCPCS Codes and the reimbursement rates charged to GEICO that would have been impossible but for their participation in a common scheme and control by the Secret Owner, to be

described in more detail below.

96.     After obtaining the prescriptions for Fraudulent Equipment as a result of their collusive relationships with the Clinic Controllers and other John Doe Defendants, the Defendants in turn then billed GEICO for: (i) Fraudulent Equipment that was not reasonable or medically necessary; (ii) Fraudulent Equipment that was not based on valid prescriptions from licensed healthcare providers; (iii) Fraudulent Equipment that did not represent the HCPCS Codes contained in the bills submitted to GEICO; and (iv) Fraudulent Equipment with inflated charges that far exceeded the value of the actual products that were purportedly provided to GEICO's Insureds.

**C.     The Fraudulent Scheme – Predetermined Fraudulent Protocols Associated with the Prescriptions**

97.     The Defendants were able to obtain prescriptions for Fraudulent Equipment that could be used as a basis to submit bills to GEICO through predetermined fraudulent protocols that were established between and among the Defendants, the Clinic Controllers, and the Referring Providers.

98.     Through these predetermined fraudulent protocols, the Defendants obtained prescriptions for the Fraudulent Equipment that were not medically necessary and were created solely to financially enrich the Defendants, not to provide medically necessary treatment to the Insureds.

99.     As set forth below, the extent of the Insureds' motor vehicle accidents, physical conditions, and conservative treatment plans demonstrates a pattern of prescribing and dispensing Fraudulent Equipment to the Insureds that was not medically necessary to treat the Insureds post-accident condition.

100.     Virtually all of the Insureds who were prescribed the Fraudulent Equipment

identified in Exhibits "1" through "6", were involved in relatively minor and low impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

101.    Concomitantly, almost none of the Insureds identified in Exhibits "1" through "6", whom the Referring Providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

102.    In keeping with the fact that many of the Insureds identified in Exhibits "1" through "6" suffered only minor injuries – to the extent that they had any injuries at all – as a result of the relatively minor accidents, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

103.    To the extent that Insureds in the claims identified in Exhibits "1" through "6" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way with nothing more than a minor soft tissue injury such as a sprain or strain.

104.    However, despite virtually all the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds were subjected to extremely similar prescription protocols for numerous pieces of Fraudulent Equipment that were not medically necessary.

105.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in an automobile accident.

106.    For example, an individual's age, height, weight, general physical condition, location within the vehicle, and the location of impact all will affect whether, how, and to what extent an individual is injured in an automobile accident.

107.    The prescriptions for Fraudulent Equipment that were purportedly issued to the

Insureds identified in Exhibits "1" through "6" were issued pursuant to predetermined fraudulent protocols set forth at each Clinic, and not because the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

108.    For example, the predetermined fraudulent protocols at each Clinic: (i) included issuing predetermined sets of Fraudulent Equipment that applied to virtually all Insureds, regardless of each patient's individual symptoms or presentation; and (ii) were not based upon what was medically necessary for each patient. Instead, they were created based upon how the John Doe Defendants, and others including the Defendants, could profit from exploiting the prescriptions purportedly issued by the Referring Providers.

109.    In other words, no legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for Fraudulent Equipment to be issued upon the fraudulent protocols at the various Clinics that were the prescription sources for the Defendants.

110.    In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment from a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patients' individual symptoms or presentation.

111.    Furthermore, in a legitimate setting, during the course of a patient's treatment, a healthcare provider may – but generally does not – prescribe DME and/or OD.

112.    In determining whether to prescribe DME and/or OD to a patient – in a legitimate setting – a healthcare provider is required to evaluate multiple factors, including: (i) whether the specific DME and/or OD could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME and/or OD is likely to help improve the

patient's complained of condition; and (iii) whether the patient is likely to use the DME and/or OD. In all circumstances, any prescribed DME and/or OD would always directly relate to each patient's individual symptoms or presentation.

113.    If a healthcare provider determines that DME and/or OD is medically necessary after considering a patient's individual circumstances and situations, in a legitimate setting, the healthcare provider will indicate in a contemporaneous medical record, such as an evaluation report, what specific DME and/or OD was prescribed, why it was medically necessary, or how it will help the Insureds.

114.    Further, in a legitimate setting, when a patient returns for an examination after being prescribed DME and/or OD, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME and/or OD aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME and/or OD or newly issued DME and/or OD.

115.    It is improbable – to the point of an impossibility – that virtually all of the Insureds identified in Exhibits "1" through "6" who were treated at a specific Clinic would receive virtually identical prescriptions for Fraudulent Equipment, despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

116.    Here, and in keeping with the fact that the prescriptions provided to the DME Entities were for medically unnecessary Fraudulent Equipment obtained as part of an insurance scheme in which there were predetermined fraudulent protocols, virtually all of the Insureds identified in Exhibits "1" through "6" that were treated at a specific Clinic were issued virtually identical prescriptions for a predetermined set of Fraudulent Equipment, despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

117.    To the extent that there was a contemporaneously dated evaluation report, the evaluation report virtually always failed to explain – and oftentimes failed to identify – the Fraudulent Equipment identified on the prescriptions provided to the Defendants and used by the Defendants to bill GEICO for the charges identified in Exhibits "1" through "6".

118.    For the reasons set forth above, and below, in each of the claims identified in Exhibits "1" through "6," the Defendants falsely represented that the Fraudulent Equipment was provided pursuant to prescriptions from healthcare providers for medically necessary DME and/or OD, and were, therefore, entitled to collect No-Fault Benefits in the first instance, when, the prescriptions were for medically unnecessary Fraudulent Equipment issued as part of the Defendants' insurance fraud scheme.

### 1.    Collusive Arrangements to Obtain Illegitimate and Medically Unnecessary Prescriptions

119.    To gain access to Insureds so that they could implement and execute their fraudulent scheme and maximize the amount of No-Fault Benefits that could be obtained from GEICO and other New York automobile insurers, the Defendants entered into collusive agreements with the Clinic Controllers and other John Doe Defendants in order to procure and direct prescriptions to the DME Entities that were illegitimate and for medically unnecessary Fraudulent Equipment.

120.    Since the inception of the Defendants' insurance scheme, the Defendants engaged in various collusive arrangements with the Clinic Controllers and other John Doe Defendants pursuant to which the Defendants paid kickbacks or other financial incentives in exchange for being provided prescriptions to fill from the Referring Providers for the Fraudulent Equipment that could then be used by the Defendants to support their charges to GEICO and other New York automobile insurers. The improper financial arrangements were key to the fraudulent scheme in

33

that they allowed the Defendants to submit hundreds of charges for Fraudulent Equipment to GEICO and other New York automobile insurers.

121.    However, the collusive nature of the arrangement goes beyond the simple payment of money or other financial incentives, but includes: (i) payment to fictitious businesses associated with the John Doe Defendants; (ii) the ability to secure the prescriptions without ever meeting the Referring Providers; (iii) obtaining the prescriptions directly from the staff at the Clinics, without any communication or involvement by the Insureds; and (iv) providing the Fraudulent Equipment to the Clinic and its staff, without any interaction with the Insureds, and without any interaction with the Defendants.

122.    The collusive arrangements allowed the scheme to remain undetected by the Insureds and allowed the Defendants to access large volumes of prescriptions that in turn afforded them the opportunity to submit charges for Fraudulent Equipment for each Insured to GEICO and other automobile insurers. But for the collusive arrangements, neither the John Doe Defendants, nor the Referring Providers would have had any reason to direct a substantial volume of these medically unnecessary prescriptions for Fraudulent Equipment to the Defendants to purportedly fill.

123.    For example, as a result of these collusive relationships, DME Entities began receiving prescriptions from the Clinics and billing GEICO for the Fraudulent Equipment for dates of service prior to the DME Entity even being incorporated:

| DME Entity: | First Date of Service: | Date of Incorporation: |
| --- | --- | --- |
| Alpine Supply | 1/29/2024 | 3/7/2024 |
| Lense Supply | 3/14/2024 | 4/9/2024 |
| Polly Supply | 7/2/2024 | 8/2/2024 |

| Mazol Supply | 9/10/2024 | 9/23/2024 |
|---|---|---|

124.    Additionally, HGY Supply began receiving prescriptions from the Clinics and billing GEICO for Fraudulent Equipment the same date of its incorporation.

125.    But for the collusive relationships between the DME Entities, Paper Owner Defendants, Clinic Controllers, Secret Owner, and other John Doe Defendants, there is no legitimate explanation as to why and how the DME Entities would have received prescriptions from the Clinics prior to their ever being incorporated.

126.    Upon information and belief, the Referring Providers were compensated by the Clinic Controllers or other John Doe Defendants, whether financially or through some other economic quid pro quo (e.g. the ability to treat the Insured and independently bill GEICO), for the Referring Providers' willingness to permit prescriptions to be issued in their names and to be given to DME suppliers, including the DME Entities, rather than given to the Insureds or to a bona fide DME/OD supplier, who would likely question its legitimacy.

127.    The collusive relationship between the Defendants and John Doe Defendants in relation to the prescriptions, issued without a specific disclosure to the patient of the financial relationship between the Referring Provider and DME Entity, are the very kind of arrangements that are prohibited by N.Y. Public Health Law § 238-d. No such disclosures required by Public Health Law § 238-d were ever made to the Insureds identified in Exhibits "1" through "6." Rather, because of the nefarious nature of the relationship between the Defendants and the John Doe Defendants, the arrangements between and among the Defendants and Referring Providers were concealed from the Insureds.

128.    As a result of these collusive relationships, the Defendants (rather than the Insured or a bona fide DME/OD retailer) were given the illegitimate prescriptions, which: (i) were for medically unnecessary Fraudulent Equipment that was not based upon each Insured's individual need; (ii) contained a photocopied signature of the Referring Provider; (iii) were undated; (iv) did not contain the name of the Referring Provider who issued the Prescription; and/or (v) were issued on a date the Referring Provider did not treat or otherwise examine the Insured.

129.    In contrast to a bona fide DME supplier, the Defendants were willing to obtain prescriptions through collusive arrangements and submit the prescriptions to support their charges to GEICO and other automobile insurers.

130.    These Clinics included but were not limited to: (i) 3250 Westchester Avenue, Bronx, New York; (ii) 540 East Fordham Road, Bronx, New York; (iii) 100 Pennsylvania Avenue, Brooklyn, New York; and (iv) 5000 Broadway, New York, New York.

131.    The Defendants were able to enter into collusive arrangements with the John Doe Defendants in order to obtain prescriptions purportedly issued by the Referring Providers because the Referring Providers operated at Clinics that are actually organized as "one-stop shops for No-Fault insurance fraud.

132.    Although ostensibly organized to provide a range of healthcare services to Insureds at a single location, many of the Clinics operate under the unlawful ownership and control of unlicensed laypersons, with a revolving door of healthcare providers providing treatment to the Insureds and other patients without any continuity of care.

133.    In fact, GEICO has received billing from an ever-changing number of fraudulent healthcare providers at a variety of different Clinics that were the sources of the prescriptions for Defendants, which start and stop operations without any purchase or sale of a "practice", without

any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's No-Fault insurance system.

134. For example, GEICO has received billing for purported healthcare services rendered at the Clinic located at 3250 Westchester Avenue, Bronx, New York, from a "revolving door" of over 40 different healthcare providers.

135. GEICO has also received billing for purported healthcare services rendered at 5000 Broadway, New York, New York from a "revolving door" of over 65 different healthcare providers.

136. Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, create and controlled the patient base at the Clinics, and directed fraudulent protocols to be used to maximize profits for the generation of revenue for their own benefit and the benefit of those with whom they are associated, without regard to actual patient care.

**2.    The Predetermined Fraudulent Protocol at the Clinics**

137. Through their collusive arrangements with the John Doe Defendants, Defendants were able to obtain medically unnecessary and otherwise illegitimate prescriptions for Fraudulent Equipment purportedly issued by a variety of Referring Providers who purported to treat Insureds at the Clinics pursuant to predetermined fraudulent protocols, which serves to further illustrate Defendants' fraudulent scheme.

138. The Insureds identified in Exhibits "1" through "6" that were prescribed Fraudulent Equipment from the Clinics were typically involved in minor "fender-bender" motor vehicle accidents and then purportedly treated by a variety of healthcare providers at the Clinics.

139.    However, during the course of their treatment at the Clinics, the Insureds were regularly prescribed Fraudulent Equipment that was medically unnecessary, not supported by medical records, and was issued pursuant to predetermined fraudulent protocols.

140.    The Defendants' control by the Secret Owner, scheme to shift billing from one DME Entity to the next, and collusion with the Clinic Controllers and other John Doe Defendants associated with the Clinics for access to the Clinics' predetermined fraudulent protocols for the prescription of Fraudulent Equipment is illustrated by the protocols employed at the Clinic located at 3250 Westchester Avenue, Bronx, New York (the "Westchester Avenue Clinic"), which is representative of the fraudulent protocols more broadly employed at the Clincs.

141.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, the Referring Providers purportedly prescribed, at a minimum, the following Fraudulent Equipment to many of the Insureds identified in Exhibits "1" through "6" who treated at the Westchester Avenue Clinic: (i) "Lumbar Sacral Cushion"; (ii) "Water Circ. W/Pump"; (iii) "Bed Board"; (iv) "Egg Crate Mattress"; (v) "Cervical Collar"; (vi) "Thermal Moist Heat Pad"; (vii) "Cervical Pillow"; and (viii) "LSO, Lumbar Sacral Orthosis".

142.    In addition, the Referring Providers would also routinely purportedly prescribe one or more separate additional prescriptions to Insureds for the following Fraudulent Equipment:

143.    Further, Insureds were also routinely provided with prescriptions for other types of Fraudulent Equipment that were purportedly provided by other medical supply companies.

144.    The prescriptions purportedly issued by the Referring Providers at the Westchester Avenue Clinic (which are representative of the types of prescriptions issued at all of the Clinics) were not based upon legitimate examinations by the Referring Providers that evaluated each

Insured's individual symptoms or presentation and determined whether and what type of DME and/or OD to provide.

145.    Rather, these prescriptions were based upon a predetermined fraudulent protocol established by the Clinic Controllers and other John Doe Defendants and were obtained by the Defendants through improper financial arrangements with the Clinic Controllers and other John Doe Defendants.

146.    Furthermore, the initial examination or follow-up examination reports, to the extent that there were contemporaneously dated examination reports, did not accurately identify the Fraudulent Equipment purportedly prescribed to the Insureds. In fact, the reports did not contain sufficient information describing the medical necessity of the prescribed Fraudulent Equipment.

147.    Even more, the follow-up examination reports from the Referring Providers at the Westchester Avenue Clinic failed to include any meaningful information regarding the Insureds' use of the previously prescribed Fraudulent Equipment, to the extent it was mentioned at all.

148.    Further illustrative of the fact that the insureds identified in Exhibits "1" through "6" that were treated at the Westchester Avenue Clinic were prescribed Fraudulent Equipment pursuant to predetermined fraudulent protocols, the Insureds were frequently purportedly issued prescriptions by the Referring Providers for a variety of Fraudulent Equipment on days that the Referring Provider did not examine or otherwise treat the Insureds, or issued prescriptions that were undated.

149.    The predetermined fraudulent protocols related to the prescriptions issued and the Defendants' common scheme to shift billing from one DME Entity to the next are illustrated by the following examples:

      (i)    On February 17, 2024, an Insured named TR was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the

Westchester Avenue Clinic. After an initial examination with Kyungsook Bu, N.P. ("Bu") on February 19, 2024, Bu purportedly issued a prescription in the name of TR, for:

| Item(s) Prescribed | Prescription Provided to: |
| --- | --- |
| Lumbar Sacral Cushion<br>Water Circ. W/Pump<br>Bed Board<br>Egg Crate Mattress<br>Cervical Collar<br>Thermal Moist Heat Pad<br>Cervical Pillow<br>LSO, Lumbar Sacral Orthosis<br>Car Seat | **Alpine Supply** |

On March 20, 2024, Bu purportedly issued a prescription in the name of TR, despite not examining or otherwise treating TR on that day, for:

| Item(s) Prescribed | Prescription Provided to: |
| --- | --- |
| LSO W/ APL Control Fitted ADJ<br>Custom Ankle Support - Left | **Alpine Supply** |

On March 21, 2024, Bu purportedly issued a prescription in the name of TR, despite not examining or otherwise treating TR on that date, for:

| Item(s) Prescribed | Prescription Provided to: |
| --- | --- |
| Cervical Traction | **Alpine Supply** |

On April 4, 2024, Bu purportedly issued a duplicitous prescription in the name of TR despite not examining or otherwise treating TR on that date, for:

| Item(s) Prescribed | Prescription Provided to: |
| --- | --- |
| Custom Ankle Support - Left | **Alpine Supply** |

On June 19, 2024, Bu purportedly issued a prescription in the name of TR despite not examining or otherwise treating TR on that date, for:

| Item(s) Prescribed | Prescription Provided to: |
|---|---|
| Thoracic LSO | **Alpine Supply** |

(ii)    On February 2, 2024, an Insured named LO was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Westchester Avenue Clinic. After an initial examination with Bu on February 5, 2024, Bu purportedly issued a prescription in the name of LO, for:

| Item(s) Prescribed | Prescription Provided to: |
|---|---|
| Lumbar Sacral Cushion<br>Water Circ. W/Pump<br>Bed Board<br>Egg Crate Mattress<br>Cervical Collar<br>Thermal Moist Heat Pad<br>Cervical Pillow<br>LSO, Lumbar Sacral Orthosis<br>Car Seat | **Alpine Supply** |

On February 14, 2024, Bu purportedly issued two prescriptions in the name of LO despite not examining or otherwise treating LO on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical Traction | **Alpine Supply** |
| 2 | Custom Shoulder Support - Left | **Alpine Supply** |

On March 6, 2024, after a purported follow-up examination with Bu, Bu purportedly issued a prescription in the name of LO, for:

| Item(s) Prescribed | Prescription Provided to: |
|---|---|
| Infrared Lamp<br>E.M.S. Unit Four Lead<br>E.M.S. Belt<br>Whirlpool | **Alpine Supply** |

(iii)    On February 9, 2024, an Insured named SL was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the

Westchester Avenue Clinic. On February 21, 2024, Bu purportedly issued a prescription in the name of SL, for:

| Item(s) Prescribed | Prescription Provided to: |
| --- | --- |
| Lumbar Sacral Cushion<br>Water Circ. W/Pump<br>Bed Board<br>Egg Crate Mattress<br>Cervical Collar<br>Thermal Moist Heat Pad<br>Cervical Pillow<br>LSO, Lumbar Sacral Orthosis<br>Car Seat | **Alpine Supply** |

On March 14, 2024, Bu purportedly issued two prescriptions in the name of SL, despite not examining or otherwise treating SL on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
| --- | --- | --- |
| 1 | Cervical Traction | **Alpine Supply** |
| 2 | LSO W/ APL Control ADJ | **Alpine Supply** |

On March 19, 2024, Bu purportedly issued a prescription in the name of SL, despite not examining or otherwise treating SL on that date, for:

| Item(s) Prescribed | Prescription Provided to: |
| --- | --- |
| Custom Shoulder Support – Left | **Alpine Supply** |

On March 25, 2024, after a purported follow-up examination with Bu, Bu purportedly issued a prescription in the name of SL, for:

| Item(s) Prescribed | Prescription Provided to: |
| --- | --- |
| Infrared Lamp<br>E.M.S. Unit Four Lead<br>E.M.S. Belt<br>Whirlpool | **Alpine Supply** |

(iv)  On December 20, 2024, an Insured named KB was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the

42

Westchester Avenue Clinic. On December 23, 2023, Bu purportedly issued a prescription in the name of KB, for:

| Item(s) Prescribed | Prescription Provided to: |
|---|---|
| Water Circ. W/Pump<br>Egg Crate Mattress<br>Cervical Collar<br>Thermal Moist Heat Pad<br>Cervical Pillow<br>LSO, Lumbar Sacral Orthosis<br>Personal Massager | **HGY Supply** |

On January 22, 2025, after a purported follow-up examination with Bu, Bu purportedly issued a prescription in the name of KB, for:

| Item(s) Prescribed | Prescription Provided to: |
|---|---|
| Infrared Heat Lamp<br>TENS Unit<br>TENS Belt<br>Whirlpool | **HGY Supply** |

On February 13, 2025, Bu purportedly issued a prescription in the name of KB, despite not examining or otherwise treating KB on that date, for:

| Item(s) Prescribed | Prescription Provided to: |
|---|---|
| Cervical Traction | **HGY Supply** |

On February 25, 2025, Bu purportedly issued two prescriptions in the name of KB, despite not examining or otherwise treating KB on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Custom Shoulder Support – Left | **HGY Supply** |
| 2 | TEJS Shoulder – Left | **HGY Supply** |

On February 26, 2025, Bu purportedly issued a prescription in the name of KB, despite not examining or otherwise treating KB that date, for:

| Item(s) Prescribed | Prescription Provided to: |
|---|---|

| LSO W/APL Control Fitted/ADJ | **HGY Supply** |
|---|---|

(v)    On November 21, 2024, an Insured named SA was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Westchester Avenue Clinic and underwent an initial examination with Bu on November 25, 2024. Bu purportedly issued SA four prescriptions, which were provided to four different DME suppliers, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Lumbar Sacral Cushion<br>Water Circ. W/Pump<br>Bed Board<br>Egg Crate Mattress<br>Cervical Collar<br>Thermal Moist Heat Pad<br>Cervical Pillow<br>LSO, Lumbar Sacral Orthosis<br>Car Seat | **HGY Supply** |
| 2 | Low Level Electromagnetic Therapy Device | Non-Defendant DME Supplier |
| 3 | Low Red Light Therapy Device | Non-Defendant DME Supplier |
| 4 | MW Therapy Device | Non-Defendant DME Supplier |

Two undated prescriptions in the name of SA were also purportedly issued by Avraham Henoch, M.D, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Spine LSO<br>Cervical Collar<br>Cervical Pillow<br>Thermophore<br>Bed Board<br>Egg Crate Mattress/Bed Board | Non-Defendant DME Supplier |
| 2 | EMS Belt<br>Massager<br>Tens accessory kit<br>Infra-Red Heating Lamp | Non-Defendant DME Supplier |

(vi)    On November 18, 2024, an Insured named IB was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Westchester Avenue Clinic and underwent an initial examination with Bu

on November 19, 2024. Bu purportedly issued three prescriptions in the name of IB, which were provided to three different DME suppliers, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Lumbar Sacral Cushion<br>Water Circ. W/Pump<br>Bed Board<br>Egg Crate Mattress<br>Cervical Collar<br>Thermal Moist Heat Pad<br>Cervical Pillow<br>LSO, Lumbar Sacral Orthosis<br>Car Seat | **HGY Supply** |
| 2 | Low Level Electromagnetic Therapy Device | Non-Defendant DME Supplier |
| 3 | Low Red Light Therapy Device | Non-Defendant DME Supplier |

On November 27, 2024, Bu purportedly issued a prescription in the name of IB, despite not examining or otherwise treating IB on that date, for:

| Item(s) Prescribed | Prescription Provided to: |
|---|---|
| Cervical Traction | **HGY Supply** |

On December 10, 2024, Bu purportedly issued two prescriptions in the name of IB, despite not examining or otherwise treating IB on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Custom Shoulder Support – Left | **HGY Supply** |
| 2 | K.O. Adjustable Knee Joints ridged – Left | **HGY Supply** |

On December 19, after a purported follow-up examination with Bu, Bu purportedly issued a prescription in the name of IB, for:

| Item(s) Prescribed | Prescription Provided to: |
|---|---|
| Infrared Heat Lamp<br>TENS Unit<br>TENS Belt<br>Whirlpool | **HGY Supply** |

On January 9, 2025, Bu purportedly issued a prescription in the name of IB, despite not examining or otherwise treating IB on that date, for:

| Item(s) Prescribed | Prescription Provided to: |
|---|---|
| TEJS Shoulder – Left | **HGY Supply** |

On February 19, 2025, after a purported follow-up examination with Bu, Bu purportedly issued two prescriptions in the name of IB, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Thoracic LSO | **Alpine Supply** |
| 2 | LSO     W/APL     Control Fitted/ADJ | **Alpine Supply** |

(vii) On October 24, 2024, an Insured named AA was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Westchester Avenue Clinic and underwent an initial examination with Bu on October 28, 2024. Bu purportedly issued a prescription in the name of AA, for:

| Item(s) Prescribed | Prescription Provided to: |
|---|---|
| Water Circ. W/Pump<br>Bed Board<br>Egg Crate Mattress<br>Cervical Collar<br>Thermal Moist Heat Pad<br>Cervical Pillow<br>LSO, Lumbar Sacral Orthosis<br>Personal Massager | **Mazol Supply** |

On November 15, 2024, Julia Ellis, N.P. purportedly issued two prescriptions in the name of AA, which were provided to two different DME suppliers, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Infrared heating pad system | Non-Defendant DME Supplier |

46

| 2 | Cervical Collar<br>Cervical Pillow<br>Egg Crate Mattress<br>Electric Heat Pad<br>LSO, Lumbar Orthosis<br>Lumbar Cushion General Use<br>Water Circ. Heat Pad W/Pump | Non-Defendant DME Supplier |

On December 10, 2024, Natasha Jagga, N.P. purportedly issued a prescription in the name of AA, for

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| EMS Placement Belt<br>Personal Massager<br>Tens Unit Four Lead | Non-Defendant DME Supplier |

On January 27, 2025, Thomasina Striano, D.C. purportedly issued a prescription in the name of AA despite not examining or otherwise treating AA on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Cervical Traction<br>Lumbar Braces (LSO)<br>Fitness Kit | Non-Defendant DME Supplier |

(viii) On October 23, 2024, and Insured named RA was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Westchester Road Clinic. After an initial examination with Bu on October 28, 2024, Bu purportedly issued four prescriptions in the name of RA, that were provided to four different DME suppliers, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Water Circ. W/Pump<br>Bed Board<br>Egg Crate Mattress<br>Cervical Collar<br>Thermal Moist Heat Pad<br>Cervical Pillow<br>LSO, Lumbar Sacral Orthosis<br>Personal Massager | **Mazol Supply** |
| 2 | Low Level Electromagnetic Therapy Device | Non-Defendant DME Supplier |

| 3 | Low Red Light Therapy Device | Non-Defendant DME Supplier |
|---|---|---|
| 4 | MW Therapy Device | Non-Defendant DME Supplier |

On November 8, 2024, Bu purportedly issued two prescriptions in the name of RA, despite not examining or otherwise treating RA on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical Traction | **Mazol Supply** |
| 2 | Custom Shoulder Support - Left | **Mazol Supply** |

On November 27, 2024, after a purported follow up examination with Bu, Bu purportedly issued three prescriptions in the name of RA, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | LSO w/APL Custom Fitted/ADH | **Mazol Supply** |
| 2 | Custom Shoulder Support – Right | **Mazol Supply** |
| 3 | TENS Belt TENS Unit Whirlpool Infrared Heat Lamp | **Mazol Supply** |

(ix)   On September 4, 2024, an Insured name NR was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Westchester Avenue Clinic and underwent an initial examination with Bu on October 7, 2024. Bu purportedly issued a prescription in the name of NR, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Lumbar Sacral Cushion Water Circ. W/Pump Bed Board Egg Crate Mattress Cervical Collar Thermal Moist Heat Pad Cervical Pillow LSO, Lumbar Sacral Orthosis Car Seat | **Mazol Supply** |

On October 16, 2024,  Bu purportedly issued three prescriptions to NR, which were provided to three different DME suppliers, despite not examining or otherwise treating NR on that date, for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Low Level Electromagnetic Therapy Device | Non-Defendant DME Supplier |
| 2 | Low Red Light Therapy Device | Non-Defendant DME Supplier |
| 3 | MW Therapy Device | Non-Defendant DME Supplier |

On October 18, 2024, Bu purportedly issued a prescription in the name of NR, despite not examining or otherwise treating NR on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| LSO W/APL Control Fitted/ADJ Cervical Traction Custom Shoulder Support – Left Thoracic LSO | **Mazol Supply** |

On November 6, 2024, after a purported follow-up examination with Bu, Bu purportedly issued a prescription in the name of NR, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Infrared Lamp TENS Unit TENS Belt Whirlpool | **Mazol Supply** |

(x)     On September 3, 2024, an Insured named AP was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Westchester Avenue Clinic and underwent an initial examination with Bu on September 16, 2024. Bu purportedly issued a prescription in the name of AP, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Water Circ. W/Pump Bed Board Egg Crate Mattress Cervical Collar Thermal Moist Heat Pad Cervical Pillow | **Polly Supply** |

| LSO, Lumbar Sacral Orthosis Personal Massager | |
|---|---|

On September 25, 2024, Bu purportedly issued a prescription in the name of AP, despite not examining or otherwise treating AP on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| K.O. Adjustable Knee joints ridged – Right | **Polly Supply** |

On September 30, 2024, Bu purportedly issued purportedly issued three prescriptions to AP, which were provided to three different DME suppliers despite not examining or otherwise treating AP on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Low Level Electromagnetic Therapy Device | Non-Defendant DME Supplier |
| 2 | Low Red Light Therapy Device | Non-Defendant DME Supplier |
| 3 | MW Therapy Device | Non-Defendant DME Supplier |

On October 16, 2024, after a purported follow-up examination with Bu, Bu purportedly issued a prescription in the name of AP, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Infrared Heat Lamp TENS Unit TENS Belt Whirlpool | **Polly Supply** |

On October 18, 2024, Bu purportedly issued a prescription in the name of AP, despite not examining or otherwise treating AP on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Thoracic LSO LSO W/APL Control Fitted/ADJ | **Polly Supply** |

(xi)    On August 20, 2024, and Insured named LG was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Westchester Avenue Clinic and underwent an initial examination with Bu on August 26, 2024. Bu purportedly issued a prescription in the name of LG, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Personal Massager<br>Water Circ. W/Pump<br>Bed Board<br>Egg Crate Mattress<br>Cervical Collar<br>Thermal Moist Heat Pad<br>Cervical Pillow<br>LSO, Lumbar Sacral Orthosis | **Polly Supply** |

On September 25, 2024, Bu purportedly issued a prescription in the name of LG, despite not examining or otherwise treating LG on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Infrared Lamp<br>TENS Unit<br>TENS Belt<br>Whirlpool | **Polly Supply** |

On September 26, 2024, Bu purportedly issued a prescription in the name of LG, despite not examining or otherwise treating LG on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Thoracic LSO | **Polly Supply** |

On September 30, 2024, Bu purportedly issued a prescription in the name of LG, despite not examining or otherwise treating LG on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Custom Shoulder Support – Left<br>Custom Shoulder Support – Right | **Polly Supply** |

On October 29, 2024, Bu purportedly issued a prescription in the name of LG, despite note examining or otherwise treating LG on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Cervical Traction<br>LSO W/APL Control Fitted/ADJ | **Polly Supply** |

(xii)    On August 20, 2024, an Insured LB was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Westchester Avenue Clinic and underwent an initial examination with Bu on August 26, 2024. Bu purportedly issued a prescription in the name of LB, for:

| Item(s) Prescribed | Prescription Provided to: |
| --- | --- |
| Water Circ. W/Pump<br>Bed Board<br>Egg Crate Mattress<br>Cervical Collar<br>Thermal Moist Heat Pad<br>Cervical Pillow<br>LSO, Lumbar Sacral Orthosis<br>Personal Massager | **Polly Supply** |

On October 8, 2024, Bu purportedly issued a prescription in the name of LB, despite not examining or otherwise treating LB on that date, for:

| Item(s) Prescribed | Prescription Provided to: |
| --- | --- |
| LSO W/APL Control Fitted/ADJ | **Polly Supply** |

(xiii)    On March 22, 2025, an Insured named MM was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Westchester Road Clinic and underwent an initial examination with Bu on March 26, 2025. Bu purportedly issued a prescription to MM, for:

| Item(s) Prescribed | Prescription Provided to: |
| --- | --- |
| Lumbar Sacral Cushion<br>Water Circ. W/Pump<br>Bed Board<br>Egg Crate Mattress<br>Cervical Collar<br>Thermal Moist Heat Pad<br>Cervical Pillow<br>LSO, Lumbar Sacral Orthosis<br>Car Seat | **GGR Supply** |

On the date of MM's initial examination, Bu also purportedly issued four prescriptions in the name of MM that were provided to four different DME companies, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Ultrasound Stimulator Low Intensity | Non-Defendant DME Supplier |
| 2 | Low Level Electromagnetic Therapy Unit | Non-Defendant DME Supplier |
| 3 | Low Red Light Therapy Unit | Non-Defendant DME Supplier |
| 4 | MV Therapy Unit | Non-Defendant DME Supplier |

On April 22, 2025, Bu purportedly issued two prescriptions in the name of MM that were given to two different DME companies, despite not examining or otherwise treating MM on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical Traction<br>Custom Shoulder Support – Left<br>TEJSD Shoulder – Left | **GGR Supply** |
| 2 | Pneumatic compressor | Non-Defendant DME Supplier |

On April 28, after a purported follow-up examination with Bu, Bu purportedly issued a prescription in the name of MM, for:

| Item(s) Prescribed | Prescription Provided to: |
|---|---|
| Infrared Lamp<br>TENS Unit<br>TENS Belt<br>Whirlpool | **GGR Supply** |

(xiv)   On March 11, 2025, an Insured named CF was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Westchester Road Clinic and underwent an initial examination with Bu on March 17, 2025. Bu purportedly issued three prescriptions in the name of CF, which were provided to three different DME suppliers, for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Personal Massager<br>Water Circ. W/Pump<br>Bed Board<br>Egg Crate Mattress<br>Cervical Collar<br>Thermal Moist Heat Pad<br>Cervical Pillow<br>LSO, Lumbar Sacral Orthosis | **GGR Supply** |
| 2 | Ultrasound Stimulator Low Intensity | Non-Defendant DME Supplier |
| 3 | Low Red Light Therapy Unit | Non-Defendant DME Supplier |

On April 3, 2025, Bu purportedly issued a prescription in the name of CF, despite not examining or otherwise treating CF on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Thoracic LSO<br>LSO W/APL Control Fitted/ADJ | **GGR Supply** |

On April 9, 2025, Bu purportedly issued a prescription in the name of CF, despite not examining or otherwise treating CF on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Pneumatic Compression | Non-Defendant DME Supplier |

On April 10, 2025, Bu purportedly issued a prescription in the name of CF, despite not examining or otherwise treating CF on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Cervical Traction | **GGR Supply** |

On April 11, 2025, Bu purportedly issued a prescription in the name of CF, despite not examining or otherwise treating CF on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Custom Shoulder Support – Left<br>TEJS Shoulder – Left | **GGR Supply** |

On April 28, 2025, after a purported follow-up examination with Bu, Bu purportedly issued a prescription in the name of CF, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Infrared Lamp<br>TENS Unit<br>TENS Belt<br>Whirlpool | **GGR Supply** |

(xv)  On February 16, 2025, an Insured named AAA was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Westchester Avenue Clinic and underwent an initial examination with Bu on February 24, 2025. Bu purportedly issued a prescription in the name of AAA, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Lumbar Sacral Cushion<br>Water Circ. W/Pump<br>Bed Board<br>Egg Crate Mattress<br>Cervical Collar<br>Thermal Moist Heat Pad<br>Cervical Pillow<br>LSO, Lumbar Sacral Orthosis<br>Car Seat | **GGR Supply** |

On the same date as AAA's initial examination, Bu also purportedly issued two prescriptions in the name of CF that were provided to two different DME companies, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Low Level Electromagnetic Therapy Device | Non-Defendant DME Supplier |
| 2 | Low Red Light Therapy Unit | Non-Defendant DME Supplier |
| 3 | MV Therapy Device | Non-Defendant DME Supplier |
| 4 | Ultrasound Stimulator Low Intensity | Non-Defendant DME Supplier |

On March 10, 2025, Bu purportedly issued a prescription in the name of AAA, despite not examining or otherwise treating AAA on that date, for:

| Item(s) Prescribed | Prescription Provided to: |
|---|---|
| Cervical Traction<br>Custom Shoulder Support – Right<br>TEJS Shoulder – Right | **GGR Supply** |

(xvi)   On February 22, 2024, an Insured named JC was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Westchester Avenue Clinic and underwent an initial examination with Bu on March 18, 2024. Bu purportedly issued a prescription in the name of JC, for:

| Item(s) Prescribed | Prescription Provided to: |
|---|---|
| Personal Massager<br>Water Circ. W/Pump<br>Bed Board<br>Egg Crate Mattress<br>Cervical Collar<br>Thermal Moist Heat Pad<br>Cervical Pillo<br>LSO, Lumbar Sacral Orthosis | **Lense Supply** |

On April 3, 2024, Bu purportedly issued a prescription in the name of JC, despite not examining or otherwise treating JC on that date, for:

| Item(s) Prescribed | Prescription Provided to: |
|---|---|
| Custom Shoulder Support - Right | **Lense Supply** |

On April 17, 2024, after a purported follow-up examination with Bu, Bu purportedly issued a prescription in the name of JC, for:

| Item(s) Prescribed | Prescription Provided to: |
|---|---|
| Infrared Lamp<br>EMS Unit Four Lead<br>EMS Belt<br>Whirlpool | **Lense Supply** |

(xvii)  On April 8, 2024, an Insured named AC was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the

Westchester Avenue Clinic and underwent an initial examination with Bu on April 8, 2024. Bu purportedly issued a prescription in the name of AC, for:

| Item(s) Prescribed | Prescription Provided to: |
|---|---|
| Lumbar Sacral Cushion<br>Water Circ. W/Pump<br>Bed Board<br>Egg Crate Mattress<br>Cervical Collar<br>Thermal Moist Heat Pad<br>Cervical Pillow<br>LSO, Lumbar Sacral Orthosis<br>Car Seat | Lense Supply |

On April 17, 2024, Bu purportedly issued a prescription in the name of AC, despite not examining or otherwise treating AC on that date, for:

| Item(s) Prescribed | Prescription Provided to: |
|---|---|
| Custom Shoulder Support – Left | Lense Supply |

On April 29, 2025, Bu purportedly issued a prescription in the name of AC, despite not examining or otherwise treating AC on that date, for:

| Item(s) Prescribed | Prescription Provided to: |
|---|---|
| LSO W/APL Control Fitted/ADJ<br>Cervical Traction | Lense Supply |

On July 24, 2024, after a purported follow-up examination with Bu, Bu purportedly issued a prescription in the name of AC, for:

| Item(s) Prescribed | Prescription Provided to: |
|---|---|
| Infrared Lamp<br>EMS Unit Four Lead<br>EMS Belt<br>Whirlpool | Alpine Supply |

(xviii) On June 28, 2024, an Insured named MC was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Westchester Avenue Clinic and underwent an initial examination with Bu

57

on July 1, 2024. Bu purportedly issued a prescription in the name of MC, for:

| Item(s) Prescribed | Prescription Provided to: |
|---|---|
| Water Circ. W/Pump<br>Bed Board<br>Egg Crate Mattress<br>Cervical Collar<br>Thermal Moist Heat Pad<br>Cervical Pillo<br>LSO, Lumbar Sacral Orthosis<br>Personal Massager | Lense Supply |

On July 19, 2024, Bu purportedly issued a prescription in the name of MC, despite not examining or otherwise treating MC on that date, for:

| Item(s) Prescribed | Prescription Provided to: |
|---|---|
| Custom Shoulder Support - Left | Lense Supply |

On July 22, 2024, Bu purportedly issued a prescription in the name of MC, despite not examining or otherwise treating MC on that date, for:

| Item(s) Prescribed | Prescription Provided to: |
|---|---|
| Cervical Traction | Lense Supply |

On July 31, 2024, after a purported follow-up examination with Bu, Bu purportedly issued a prescription in the name of MC, for:

| Item(s) Prescribed | Prescription Provided to: |
|---|---|
| Infrared Lamp<br>EMS Unit Four Leads<br>EMS Belt<br>Whirlpool | Lense Supply |

On August 2, 2024, Bu purportedly issued a prescription in the name of MC, despite not examining or otherwise treating MC on that date, for:

| Item(s) Prescribed | Prescription Provided to: |
|---|---|
| LSO W/APL Custom Fitted/ADJ Thoracic LSO | **Alpine Supply** |

150.    These are only representative samples.

151.    In fact, virtually all of the Insureds identified in Exhibits "1" through "6" who treated at the Westchester Avenue Clinic were issued prescriptions for Fraudulent Equipment pursuant to the predetermined fraudulent protocols identified above, despite only being involved in relatively minor and low-impact motor vehicle accidents.

### D.    The Defendants' Manipulation of the Prescriptions

152.    Once the Defendants obtained the prescriptions purportedly issued by the Referring Providers as a result of the Defendants' collusive arrangements with the John Doe Defendants, the Defendants used the prescriptions to bill GEICO for whatever DME or OD they wanted.

153.    In doing so, the Defendants did not bill GEICO for medically necessary DME and OD as determined by a licensed healthcare provider. Instead, the Defendants unlawfully decided what DME and OD to provide Insureds without a proper prescription from a licensed healthcare provider.

154.    As part of the Defendants' common fraudulent scheme and collusive arrangement with the John Doe Defendants, they utilized the vague and generic prescriptions purportedly issued by the Referring Providers to misrepresent to GEICO the nature of the items actually prescribed and misrepresent that the Fraudulent Equipment was for DME/OD that was determined by a licensed healthcare provider to be medically necessary for each Insured.

155.    Upon obtaining the vague and generic prescriptions from Clinic Controllers or other persons associated with the Clinics pursuant to the predetermined protocols and collusive arrangements described above, the Defendants were provided with the opportunity to choose one of several different pieces of Fraudulent Equipment, with varying reimbursement rates in the applicable fee schedule, that relate to the vague and generic terms indicated in the prescription.

156.    The ability to choose which specific type of DME and/or OD to provide an individual is specifically reserved for healthcare providers authorized by law to prescribe DME and/or OD.

157.    As unlicensed healthcare providers, the Paper Owner Defendants were not and are not legally authorized to prescribe or direct that an Insured receive any specific type of DME and/or OD. Similarly, the DME Entities are not licensed professional corporations and do not employ any healthcare professionals who can legally prescribe or direct that an Insured receive any specific type of DME and/or OD.

158.    However, when the Defendants received vague and generic prescriptions for Fraudulent Equipment to purportedly provide Insureds, many of the items in the prescriptions were not specific enough to identify a specific item of DME and/or OD that could be provided to the Insureds.

159.    As a result, and as part of their common scheme, whenever the vague and generic prescriptions identified a type of Fraudulent Equipment that had multiple different HCPCS Codes, which are based on the specific and unique features associated with the item, the Defendants each chose to bill GEICO using the same specific HCPCS Codes thereby representing that they purportedly provided those unique pieces of Fraudulent Equipment to the Insureds.

160.    In a legitimate setting, upon receiving a vague and generic prescription for a type of DME and/or OD, the provider of DME and/or OD would contact the referring healthcare provider to request clarification on the specific items and features necessary to dispense to each patient.

161.    However, in all of the claims identified in Exhibits "1" through "6", whenever there was a vague and generic prescription for a type of DME and/or OD, the Defendants never contacted the Referring Provider to request clarification. Instead, the Defendants made their own determination as to which unique item of Fraudulent Equipment to provide each Insured.

162.    Furthermore, in each and every circumstance where the vague and generic prescriptions allowed the Defendants to choose a unique piece Fraudulent Equipment, the Defendants billed GEICO for, and thereby chose to purportedly provide the Insured with, the type of Fraudulent Equipment that resulted in one of the higher maximum reimbursable amounts under the applicable fee schedule.

163.    For example, in many of the prescriptions issued to the Defendants that are part of the claims identified in Exhibits "1" through "6", the prescriptions requested that the Defendants provide generic items such as "Lumbar Sacral Support" or "LSO" without any further specification.

164.    This vague and generic language in the prescriptions from the Referring Providers for a "Lumbar Sacral Support" or "LSO" directly relates to over 20 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount, which can be dispensed to Insureds, including:

     (i)    HCPCS Code L0625, a lumbar orthosis device that is flexible, prefabricated and off-the-shelf, has a maximum reimbursement rate of $43.27.

     (ii)   HCPCS Code L0626, a lumbar orthosis device with rigid posterior panel(s)

that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $61.25.

(iii)    HCPCS Code L0627, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $322.98.

(i)    HCPCS Code L0628, a lumbar-sacral orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $65.92.

(ii)    HCPCS Code L0629, a lumbar-sacral orthosis device that is flexible and custom fabricated, which has a maximum reimbursement rate of $175.00.

(iii)    HCPCS Code L0630, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $127.26.

(iv)    HCPCS Code L0631, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $806.64.

(v)    HCPCS Code L0632, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is custom fabricated, which has a maximum reimbursement rate of $1,150.00.

(vi)    HCPCS Code L0633, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $225.31.

(vii)    HCPCS Code L0634, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $759.92.

(viii)    HCPCS Code L0635, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is prefabricated, which has a maximum reimbursement rate of $765.98.

(ix)    HCPCS Code L0636, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1,036.35.

(x)    HCPCS Code L0637, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xi)   HCPCS Code L0638, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1,036.35.

(xii)   HCPCS Code L0639, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xiii)   HCPCS Code L0640, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $822.21.

(xiv)   HCPCS Code L0641, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $53.80.

(xv)   HCPCS Code L0642, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $283.76.

(xvi)   HCPCS Code L0643, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $111.80.

(xvii)   HCPCS Code L0648, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $708.65.

(xviii)   HCPCS Code L0649, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $197.95.

(xix)   HCPCS Code L0650, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

(xx)   HCPCS Code L0651, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

165.   As unlicensed healthcare providers, the DME Entities and Paper Owner Defendants were not legally permitted to determine which of the above-available options were best suited for each Insured that had generic prescriptions for a "Lumbar Sacral Support" or "LSO".

166.    Here, the Defendants never contacted any of the Referring Providers whose names appeared on the vague and generic prescriptions for a "Lumbar Sacral Support" or "LSO" and instead took it upon themselves to decide which specific type of Fraudulent Equipment they would bill GEICO for, and accordingly purportedly provide the Insureds.

167.    In response to such prescriptions, each of the DME Entities virtually always submitted a charge of $747.55 using HCPCS Code L0648 which has one of the highest maximum reimbursable amounts out of the lumbar support items in the Fee Schedule.

168.    Additionally, and as part of Defendants' common scheme and the control by the Secret Owner, virtually every time that each of the DME Entities received a prescription from the Referring Providers for a "LSO w/ APL Custom Fitted/ADJ", the Defendants each billed GEICO using HCPCS Code L0632 requesting a reimbursement of $1,150.00.00 and thereby asserted that they provided the Insureds with that specific item, which resulted in further needlessly inflated charges to GEICO.

169.    Further and as part of Defendants' common scheme and the control of the Secret Owner, each and every time that each of the DME Entities received a prescription from the Referring Providers for a "KO Custom Fitted," or "KO Adjustable Knee joints ridged" each of the Defendants chose to supply and bill GEICO using HCPCS Code L1844 requesting a reimbursement of $1,107.00, despite the Fee Scheduling containing 20 different types of knee orthoses.

170.    Similarly, and as part of the common scheme and control of the Secret Owner, each and every time that each of the DME Entities received a prescription form the Referring Providers for a "Custom Shoulder Support", the Defendants chose to supply and bill GEICO using HCPCS

Code L3961 requesting reimbursement of $1,286.96, despite the Fee Schedule containing eight different types of shoulder orthoses.

171.    These are only representative examples. In virtually all of the claims for Fraudulent Equipment identified in Exhibits "1" through "6" that are based upon vague and generic language in prescriptions provided by the Referring Providers, the Defendants decided the unique type of Fraudulent Equipment to purportedly provide Insureds without any legal authority to do so or any clarification from the prescribing healthcare provider.

### E.    The Defendants' Common Fraudulent Misrepresentations Regarding the DME and OD Purportedly Dispensed

172.    In addition to obtaining medically unnecessary prescriptions based upon predetermined fraudulent protocols, collusive arrangements with the John Doe Defendants, and dispensing the Fraudulent Equipment without a licensed healthcare provider determining the specific DME/OD was medically necessary, the Defendants each submitted bills to GEICO that misrepresented the DME/OD provided to the Insureds – to the extent that any DME/OD actually was provided.

173.    As part of Defendants' common scheme and control by the Secret Owner, the bills submitted to GEICO and other New York automobile insurers by Defendants made virtually identical misrepresentations regarding the HCPCS Codes used for the Fee Schedule items purportedly provided and the maximum reimbursement rate charged for Non-Fee Schedule items.

174.    Specifically, the bills submitted to GEICO by the Defendants each misrepresented, to the extent that any Fraudulent Equipment was provided, that the type of Fraudulent Equipment matched the HCPCS Codes identified in the bills to GEICO, when in fact they did not.

175.    Further, the bills submitted to GEICO by the Defendants each misrepresented, to the extent that any Fraudulent Equipment was provided, that the charges for Non-Fee Schedule

items were less than or equal to the maximum reimbursement rate allowable under the Fee Schedule, when in fact they were not.

### 1.    The Defendants Fraudulently Misrepresented the Fee Schedule Items Purportedly Provided

176.    When the Defendants submitted bills to GEICO and other New York automobile insurers, they represented that the Fraudulent Equipment was not only provided to the Insureds, but also that the HCPCS Codes used on the bills properly described the type of Fraudulent Equipment that was provided to the Insureds.

177.    As part of the Defendants' common scheme and their operation at the direction and control of the Secret Owner, each of the DME Entities made virtually identical misrepresentations in the HCPCS Codes used to bill GEICO.

178.    As indicated above, the Fee Schedule specifically defines the requirements for each HCPCS Code to bill for DME and/or OD.

179.    Additionally, Palmetto provides specific characteristics and requirements that DME and OD must meet in order to qualify for reimbursement under a specific HCPCS Code for both Fee Schedule items and Non-Fee Schedule items.

180.    By submitting bills to GEICO containing specific HCPCS Codes, the Defendants each represented that the Fraudulent Equipment they purportedly provided to Insureds appropriately corresponded to the HCPCS Codes contained within each bill.

181.    However, in many of the claims for Fraudulent Equipment identified in Exhibits "1" through "6", when the Defendants submitted bills to GEICO, they fraudulently misrepresented to GEICO that the HCPCS Codes used to bill GEICO were accurate and appropriate for the Fraudulent Equipment purportedly provided to the Insureds – to the extent that any Fraudulent Equipment was actually provided.

182.    Accordingly, to the extent that the prescriptions were actually authorized in the first place, the John Doe Defendants and Referring Providers purposefully provided prescriptions to the Defendants that contained general categories of Fraudulent Equipment to purportedly provide the Insureds.

183.    Based upon the vague and generic prescriptions that the Defendants received, the Defendants were able to choose between multiple types of products that would fit the vague description contained on the prescription.

184.    As part of their common scheme, although several options were available to the Defendants based upon the vague and generic prescriptions, the Defendants often billed GEICO – and likely other New York automobile insurers – using HCPCS Codes that contained one of the higher reimbursement amounts, and did so for their financial benefit.

185.    However, despite billing for Fraudulent Equipment using HCPCS Codes that had one of the higher reimbursement amounts, to the extent that Defendants provided any of the Fraudulent Equipment, the HCPCS Codes in the bills submitted to GEICO often severely misrepresented the type of Fraudulent Equipment that was purportedly provided to the Insureds.

186.    For example, each of the Defendants submitted bills to GEICO that fraudulently misrepresented the type of Fraudulent Equipment that they purportedly provided by billing GEICO for customized pieces of Fraudulent Equipment when the Fraudulent Equipment was not customized at all – to the extent that Fraudulent Equipment was actually provided.

187.    As identified in the claims contained withing Exhibits "1" through "6", the Defendants often billed GEICO for Fraudulent Equipment that was purportedly customized for the Insured. Each HCPCS Code, as defined either by the applicable fee schedule or Palmetto, will

specify whether the specific item provided to a patient is either "off-the-shelf" or specifically "custom-fabricated" or "custom-fitted" for that individual patient.

188.   In order to help clarify the term "custom-fabricated", Palmetto defined a custom-fabricated orthotic as something that "is individually made for a specific patient. No other patient would be able to use this item. A custom fabricated items is a device which is fabricated based on clinically derived and rectified castings, tracings, measurements, and/or other images (such as x-rays) of the body part. The fabrication may involve using calculations, templates and components. This process requires the use of basic materials including, but not limited to plastic, metal, leather or cloth in the form of uncut or unshaped sheets, bars, or other basic forms and involves substantial work such as vacuum forming, cutting, bending, molding, sewing, drilling and finishing prior to fitting on the patient." See Palmetto, Correct Coding -3-D Printed Orthotic Devices.

189.   In essence, a custom-fabricated orthotic is created and manufactured from scratch for use by a specific patient.

190.   To help clarify the term "custom-fitted", Palmetto defined a custom-fitted orthotic as something that "requires more than minimal self-adjustment at the time of delivery in order to provide an individualized fit, i.e., the item must be trimmed, bent, molded (with or without heat), or otherwise modified resulting in alterations beyond minimal self-adjustment." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

191.   One of the key factors in identifying a "custom-fitted" orthotic is whether the item requires "minimal self-adjustment" or "substantial modification." Minimum self-adjustment, which for an off-the-shelf orthotic means adjustment that the "beneficiary, caretaker for the beneficiary, or supplier of the device can perform and that does not require the services of a

certified orthotist (that is, an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification) or an individual who has specialized training.  For example, adjustment of straps and closures, bending or trimming for final fit or comfort (not all-inclusive) falls into this category."  See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

192.    By contrast, a substantial modification, which is required for a custom-fitted orthotic, is defined as "changes made to achieve an individualized fit of the item that requires the expertise of a certified orthotist or an individual who has equivalent specialized training in the provision of orthotics such as a physician, treating practitioner, an occupational therapist, or physical therapist in compliance with all applicable Federal and State licensure and regulatory requirements.  A certified orthotist is defined as an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification."  See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

193.    As shown in the claims identified within Exhibits "1" through "6", Defendants often billed for Fraudulent Equipment that was purportedly "custom-fabricated" or "custom-fitted" for each Insured when – and to the extent that Fraudulent Equipment was actually provided – the items were never custom fabricated or fitted, as that term is defined by Palmetto.

194.    Based upon the prescriptions allegedly issued by the Referring Providers, Defendants each submitted numerous bills to GEICO for custom fabricated back braces under HCPCS Code L0632 which contained a charge for $1,150.00, customized shoulder-elbow-wrist-

hand orthosis ("SEWHO") under HCPCS Code L3961 which contained a charge for $1,286.96, and custom knee orthoses using HCPCS Code L1844 which contained a charge for $1,107.70.

195.    The products assigned to HCPCS Codes L0632, L3961, and L1844 are types of orthoses that are customed to fit a particular patient by an individual with expertise, not the prefabricated, off-the-shelf products that could be adjusted by the patients (by simply tightening the straps) and which were dispensed by the Defendants.

196.    Instead, to the extent that the Defendants provided any Fraudulent Equipment billed to GEICO as custom-fitted or custom-fabricated OD, including the charges for L0632, L3961, and L1844, the Fraudulent Equipment was provided without taking any action to custom-fabricate or custom-fit the OD to the Insureds. To the extent that Defendants attempted to many any adjustments to the DME received by Insureds identified in Exhibits "1" through "6", Defendants only provided minimal self-adjustment, as defined by Palmetto, which only supports charges for off-the-shelf items.

197.    In keeping with the fact that the Defendants misrepresented that they custom-fabricated or fit OD purportedly provided to Insureds and billed to GEICO, the Paper Owner Defendants are not certified orthotists and did not complete sufficient training to become a certified orthotist.

198.    In addition to the Defendants collectively submitting over 650 charges that falsely represented that the Defendants provided custom-fabricated or custom-fit OD, the Defendants also each submitted bills to GEICO using HCPCS Codes that knowingly misrepresented the type of Fraudulent Equipment that was purportedly provided to the Insureds to the extent that any DME was actually provided.

199.    The claims identified in Exhibits "1" through "6" for HCPCS Code E0184 are another example of the Defendants fraudulent mispresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

200.    Each of the claims identified within Exhibits "1" through "6" for HCPCS Code E0184 contained a charge for $171.43 based upon prescriptions for an "Egg Crate Mattress".

201.    However, the product represented by HCPCS Code E0184 is defined as a dry pressure mattress, which is an actual full-size mattress, not a mattress topper or pad in the shape of an egg crate.

202.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E0184, the items provided by the Defendants – to the extent that the Defendants provided the Insureds with any item – were not dry pressure mattresses as required by HCPCS Code E0184.

203.    By contrast, to the extent that any items were provided, they were mattress pads or toppers in the shape of egg crates, not an actual mattress. Mattress pads are Fee Schedule items listed under HCPCS Code E0199, which is defined as a "Dry pressure pad for mattress, standard mattress length and width."

204.    Unlike the fraudulent charges for $171.43 for each eggcrate mattress billed under HCPCS Code E0184 – and in keeping with the fact that the fraudulent charges were part of Defendants' common scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $19.48 for each mattress pad/topper billed under HCPCS Code E0199.

205.    In each of the claims identified within Exhibits "1" through "6" where Defendants billed for Fraudulent Equipment under HCPCS Code E0184, each of the bills fraudulently

misrepresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0184.

206.    The claims identified in Exhibits "1" through "6" for HCPCS Code E2612 are another example of how the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided – as part of their common scheme.

207.    Each of the claims identified withing Exhibits "1" through "6" for HCPCS Code E2612 contained a charge for $364.05 based upon prescriptions for a "Lumbar Sacral Cushion."

208.    However, the product represented by HCPCS Code E2612 is defined as a general use wheelchair cushion with a width of 22 inches or greater.

209.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E2612, the items provided by the Defendants – to the extent that the Defendants provided the Insureds with any items in response to the prescriptions for a lumbar sacral cushion – were not cushions for use with a wheelchair.

210.    In keeping with the fact that the cushions provided to the Insureds were not for a wheelchair, virtually none of the Insureds identified in Exhibits "1" through "6" who were provided with a cushion by Defendants that was billed to GEICO under HCPCS Code E2612, were in a wheelchair.

211.    By contrast, to the extent that any items were provided, the items were positioning cushions, which are Fee Schedule items listed under HCPCS Code E0190. HCPCS Code E0190 is defined as a "Positioning cushion/pillow/wedge, any shape or size, includes all components and accessories."

212.    Unlike the fraudulent charges for $364.05 for each "Lumbar Sacral Cushion" billed under HCPCS Code E2612 – and in keeping with the fact that the fraudulent charges were part of Defendants' common scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $22.04 for each positioning cushion billed under HCPCS Code E0190.

213.    In each of the claims identified within Exhibits "1" through ""6" where Defendants billed for Fraudulent Equipment under HCPCS Code E2612, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E2612.

214.    The claims identified in Exhibits "1" through "6" for HCPCS Code E0480 are another example of how the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided – as part of their common scheme.

215.    Each of the claims identified within Exhibits "1" through "6" for HCPCS Code E0840 contained a charge of $355.56 based upon prescriptions for a "personal massager".

216.    However, the product represented by HCPCS Code E0480 is defined as an airway clearance percussor device, which is used to help prevent aspiration in a patient by clearing excessive mucus and is typically prescribed to patients diagnosed with cystic fibrosis, chronic bronchitis, muscular dystrophy, or who have other conditions that inhibit a patient's ability to expectorate.

217.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E0480, the items provided by the Defendants – to the extent that the Defendants provided

the Insureds with any item – were not airway clearance devices as required by HCPCS Code E0480.

218.    By contrast, to the extent that any items were provided, they were personal massagers. Personal massagers are Non-Fee Schedule items, which should have been billed under HCPCS Code E1399.

219.    As a Non-Fee Schedule item, the reimbursement for HCPCS Code E1399 is the lesser of either 150% of the acquisition cost to the Defendants or the cost to the general public.

220.    Unlike the fraudulent charges for $355.56 for each "personal massager" billed under HCPCS Code E0840 – and in keeping with the fact that the fraudulent charges were part of the Defendants' scheme to defraud GEICO and other automobile insurers – the Defendants' acquisition of one of these massagers was significantly less than the $355.56 charged to GEICO.

221.    In each of the claims identified within Exhibits "1" through "6" where the Defendants billed for Fraudulent Equipment under HCPCS Code E0840, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0480.

222.    These are only representative examples. In the bills submitted to GEICO, and as shown in the charges identified in Exhibits "1" through "6" for Fee Schedule items, the Defendants regularly misrepresented the Fraudulent Equipment provided to the Insureds, to the extent that any Fraudulent Equipment was provided, in order to maximize the amount of No-Fault Benefits that they could obtain from GEICO.

      **2.    The Defendants Fraudulently Misrepresented the Rate of Reimbursement for Non-Fee Schedule Items**

223.    As indicated above, under the No-Fault Laws, Non-Fee Schedule items are reimbursable as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

224.    By submitting bills to GEICO for Non-Fee Schedule items, Defendants each represented that they requested permissible reimbursement amounts that were calculated as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the specific item.

225.    However, and as part of their common scheme and control by the Secret Owner, in virtually all of the charges to GEICO identified in Exhibits "1" through "6" for Non-Fee Schedule items, Defendants fraudulently represented to GEICO that the reimbursement sought was the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

226.    Instead, Defendants submitted bills to GEICO containing virtually identical charges that significantly inflated the permissible reimbursement amount of Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits they were able to obtain from GEICO and other automobile insurers.

227.    The Defendants were able to perpetuate this scheme to fraudulently overcharge Non-Fee Schedule items by providing Insureds – to the extent that they actually provided any Fraudulent Equipment – with low-cost and low-quality Fraudulent Equipment.

228.    When the Defendants submitted bills to GEICO seeking No-Fault Benefits for Non-Fee Schedule items, the charges fraudulently represented 150% of Defendants' acquisition cost of purportedly high-quality items. In actuality, the Defendants' legitimate acquisition cost for the low-quality items was significantly less.

229.    In keeping with the fact that the Defendants fraudulently misrepresented the permissible reimbursement amounts in the bills submitted to GEICO for the Non-Fee Schedule items solely for their financial benefit, the Defendants purposefully attempted to conceal their effort to overcharge GEICO for Non-Fee Schedule items by never submitting a copy of their acquisition invoices in conjunction with their bills.

230.    The Defendants did not include invoices showing their legitimate cost to acquire the low-cost and low-quality Non-Fee Schedule items in the bills submitted to GEICO because the invoices would have shown that the permissible reimbursement amounts were significantly less than the charges contained in the bills.

231.    As part of their common scheme, the charges submitted to GEICO for Non-Fee Schedule items identified in Exhibits "1" through "6", virtually always misrepresented the permissible reimbursement amount.

232.    For example, Defendants each billed GEICO for infrared heat lamps under HCPCS Code E0205 with a charge of $385.47 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

233.    Unlike the fraudulent charges for $385.47 submitted by the Defendants under HCPCS Code E0205 for infrared heat lamps, the maximum reimbursement rate that the Defendants were entitled to receive was significantly less.

234.    The Defendants also each billed GEICO for whirlpools under HCPCS Code E1310 with a charge of $424.00 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

235.    Unlike the fraudulent charges for $424.00 submitted by the Defendants under HCPCS Code E1310 for whirlpools, the maximum reimbursement rate the Defendants were entitled to receive was significantly less.

236.    These are only representative examples. In each of the claims identified within Exhibits "1" through "6" for Non-Fee Schedule items, each of the Defendants fraudulently misrepresented in the bills submitted to GEICO that the charges were the lesser of 150% of the acquisition cost or the cost to the general public.

237.    In the bills submitted to GEICO, and as shown in the charges identified in Exhibits "1" through "6", the Defendants regularly misrepresented and inflated the charges submitted to GEICO for Non-Fee Schedule items, to the extent that any Fraudulent Equipment was provided, in order to maximize the amount of No-Fault Benefits that they could obtain from GEICO.

**F.    The Defendants' Failure to Comply with Local Licensing Provisions**

238.    As stated above, for a DME/OD supplier to provide DME or OD to automobile accident victims within the City of New York, the DME/OD supplier must obtain a Dealer in Products License by the DCWP.

239.    For Defendants to lawfully provide DME/OD to the Insureds identified in Exhibits "1" through "6", the DME Entities were required to obtain a Dealer in Products License because an overwhelming majority of the Insureds identified in Exhibits "1" through "6" were located within the City of New York.

240.    In addition to obtaining sufficient revenue from Insureds within the City of New York, the DME Entities were required to have a Dealer in Products License because the Fraudulent Equipment purportedly provided to the Insureds fell within the definition of "Products for the Disabled" as defined under NYC Admin. Code § 20-425.

77

241.     However, Alpine Supply, Lense Supply, Polly Supply, and Mazol Supply did not obtain a Dealer in Products License issued by the DCWP until after they started submitting bills to GEICO.

242.     The chart below illustrates when each DME Entity obtained a Dealer In Products License from the DCWP in comparison to when each DME Entity first submitted bills to GEICO:

| DME Entity: | Date First Billed: | DCWP Licensure Date: |
|---|---|---|
| **Alpine Supply** | 1/29/2024 | 3/27/2024 |
| **Lense Supply** | 3/14/2024 | 4/26/2024 |
| **Polly Supply** | 7/2/2024 | 8/7/2024 |
| **Mazol Supply** | 9/10/2024 | 10/10/2024 |

243.     As a result, Alpine Supply, Lense Supply, Polly Supply, and Mazol Supply were not eligible to collect No-Fault Benefits because they failed to comply with all local licensing requirements as they did not obtain a Dealer in Products license issued by the DCWP prior to operating as DME/OD supplier.

244.     Further, and as part of the Defendants' scheme to defraud GEICO and other New York automobile insurers, eventually the DME Entities did seek a Dealer in Products License from the DCWP in an effort to have the DME Entities appear to be legitimate.

245.     However, the DME Entities remained ineligible to collect No-Fault Benefits from GEICO, and other automobile insurers, because they were never lawfully licensed by the DCWP to provide DME and/or OD to Insureds.

246.     For example, the DME Entities were not lawfully licensed by the DCWP because they obtained Dealer in Products Licenses through fraud and/or misrepresentations.

247.    As part of obtaining a Dealer in Products License, each of the DME Entities completed a license application form that required it to identify – among other things – all individuals who have more than a 10% ownership interest in the entity.

248.    Each Dealer in Products License application contains an affirmation to be signed with a penalty for false statements under Section 170.35 of New York's Penal Law.

249.    However, none of the applications for the Dealer in Products Licenses for the DME Entities identified the Secret Owner or the ownership interest of the Secret Owner.

250.    Instead, and in support of the fact that the Defendants scheme to defraud GEICO and other automobile insurers of No-Fault Benefits, each of the applications falsely represented that the DME Entities were 100% owned by the Paper Owner Defendants.

251.    Accordingly, the DME Entities were never entitled to receive No-Fault Benefits because they failed to comply with all significant statutory and regulatory requirements by operating as a DME/OD supplier within the City of New York without a valid Dealer in Products License.

252.    In each of the claims identified in Exhibits "1" through "6", the Defendants knowingly misrepresented that they were properly licensed with all local and stator and regulatory requirements and were lawfully permitted to provide DME/OD to Insureds, when Defendants were never entitled to collect No-Fault Benefits in the first instance, because the DME Entities did not lawfully obtain a Dealer in Products License because they received their Dealer in Products License under the false pretenses described above.

## III.    The Fraudulent Billing the DME Entities Submitted or Caused to Be Submitted to GEICO

253.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms or HCFA-1500 forms to GEICO through and in the names of the DME Entities, seeking payment for the Fraudulent Equipment.

254.    The NF-3 forms and HCFA-1500 forms that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and/or OD and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any Fraudulent Equipment, it was pursuant to a fraudulent scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others no presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols;

(ii)    The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any Fraudulent Equipment, it was pursuant to a fraudulent scheme that included dispensing Fraudulent Equipment based on prescriptions secured through collusive arrangements with the John Doe Defendants;

(iii)   The NF-3 forms, HCFA-1500 forms, and prescriptions, uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to prescriptions from licensed healthcare providers for reasonable and medically necessary DME and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because to the extent that the Defendants provided any Fraudulent Equipment, it was based on decisions made by laypersons, not based upon lawful prescriptions from licensed healthcare providers for medically necessary items;

(iv)    The NF-3 forms, HCFA-1500 forms, and prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent

Equipment that directly corresponded to the HCPCS Codes contained within each form and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Defendants provided any Fraudulent Equipment to the Insureds – the Fraudulent Equipment often did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms and HCFA-1500 forms;

(v)     The NF-3 forms, HCFA-1500 forms, and prescriptions uniformly misrepresented to GEICO the reimbursement amount for the Non-Fee Schedule items provided to the Insureds, to the extent that the Defendants provided any Fraudulent Equipment, and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Defendants provided any Fraudulent Equipment to the Insureds – falsified the permissible reimbursement amounts for the Fraudulent Equipment identified in the NF-3 forms and HCFA-1500 forms; and

(vi)    The NF-3 forms, HCFA-1500 forms, and prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment while they were in compliance with all local licensing requirements. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any Fraudulent Equipment, they were not properly licensed by the DCWP as they either failed to obtain a Dealer in Products License from the DCWP prior to billing, or falsified the information contained in their application for a Dealer in Products License.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

255.    The Defendants legally and ethically are obligated to act honestly and with integrity in connection with the provision of DME and OD to Insureds, and their actual submission of charges to GEICO.

256.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Equipment, the Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

257.    Specifically, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the provision of the Fraudulent Equipment was

pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as the benefit the Defendants and others not presently known (i.e., the John Doe Defendants), without regard for genuine patient care.

258.    Additionally, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the provision of the Fraudulent Equipment was pursuant to an insurance fraud scheme, which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements.

259.    Furthermore, the Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the provision of the Fraudulent Equipment dispensed was pursuant to an insurance fraud scheme in which decisions were made by laypersons, without legal authority to issue a prescription, and not by an actual healthcare provider.

260.    In addition, the Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by the Defendants to GEICO did not accurately reflect the type of Fraudulent Equipment purportedly provided to Insureds.

261.    The Defendants also knowingly misrepresented the permissible reimbursement amount of the Non-Fee Schedule items contained in the bills submitted by the Defendants to GEICO and did not include any invoices to support the charges in order to prevent GEICO from discovering that Non-Fee Schedule items were billed to GEICO for financial gain.

262.    Finally, the Defendants knowingly misrepresented that they were lawfully licensed by the City of New York as they never complied with regulations requiring the DME Entities to obtain a Dealer in Products License from the DCWP because the DME Entities were either not

licensed by the DCWP prior to billing or received their licenses under false pretenses and concealed these misrepresentations in order to submit bills to GEICO and prevent GEICO from discovering that Fraudulent Equipment was billed to GEICO for financial gain.

263.    The Defendants operating their fraudulent scheme in a "quick hit" fashion designed to frustrate GEICO's efforts to identify fraud, shifting the billing from one DME Entity to the next over the course of several months. The billing and supporting documentation submitted by the DME Entities, when viewed in isolation, did not reveal its fraudulent nature.

264.    The Defendants hired law firms to pursue collection of the charges associated with the Fraudulent Equipment from GEICO and other automobile insurers. Those law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

265.    The Defendants' collection efforts through the filing and prosecution of numerous separate No-Fault collection proceedings, which proceedings may continue for years, is an essential party of their fraudulent scheme, since they know it is impractical for an arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area. The purpose of the mass filings of No-Fault collection proceedings is to monetize the fraud and further perpetuate the RICO enterprise.

266.    In fact, the Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard to the fact that the Defendants have been engaged in widespread fraud.

267.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to, and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $1 million based upon the fraudulent charges.

268.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against the DME Entities**
**(Declaratory Judgement, 28 U.S.C. §§ 2201 and 2202)**

269.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

270.    There is an actual case in controversy between GEICO and each of the DME Entities regarding more than $420,000.00 in fraudulent pending billing that has been submitted to GEICO in the names of the DME Entities.

271.    The DME Entities have no right to receive payment for any pending bills submitted to GEICO because the bills for Fraudulent Equipment were not based upon medical necessity but were instead submitted as part of an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known (i.e., the John Doe Defendants), without regard for genuine patient care.

272.    The DME Entities have no right to receive payment for any pending bills submitted to GEICO because the bills for the Fraudulent Equipment were pursuant to an insurance fraud scheme, which included dispensing Fraudulent Equipment that was not medically necessary and

prescribed pursuant to predetermined fraudulent protocols and prescriptions secured though collusive arrangements.

273.    The DME Entities have no right to receive payment for any pending bills submitted to GEICO because the DME Entities purportedly provided Fraudulent Equipment as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions.

274.    The DME Entities have no right to receive payment for any pending bills submitted to GEICO because – to the extent that the DME Entities actually provided any Fraudulent Equipment – the DME Entities fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds.

275.    The DME Entities have no right to receive payment for any pending bills submitted to GEICO because – to the extent that the DME Entities actually provided any Fraudulent Equipment – the DME Entities fraudulently misrepresented that the charges for Non-Fee Schedule items contained within the bills to GEICO were less than or equal to the maximum permissible reimbursement amount.

276.    The DME Entities have no right to receive payment for any pending bills submitted to GEICO because they failed to comply with local licensing requirements and either did not obtain a Dealer in Products License from the DCWP prior to submitted bills to GEICO, or concealed the ownership interests of the Secret Owner in their applications for a Dealer in Products License, and thus, were not properly lawfully licensed by the DCWP as required by regulations from the City of New York.

277.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgement Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the DME Entities.

**SECOND CAUSE OF ACTION**
**Against the Paper Owner Defendants and the Secret Owner**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

278.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

279.    The DME Entities together constitute an association in fact enterprise ("the DME Entity Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

280.    The members of the DME Entity Enterprise are and have been associated through time, joined in purpose, and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, the DME Entities are ostensibly independent businesses – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO.

281.    The DME Entity Enterprise operated under six separate names and tax identification numbers in order to limit the time period and volume of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other New York automobile insurers and to limit the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the DME Entity Enterprise acting singly or without the aid of each other.

282.    The DME Entity Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing, and coordinating many individuals who have been responsible for facilitating and performing a wide variety of administrative and ostensibly professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

283.    The Paper Owner Defendants and the Secret Owner have each been employed by and/or associated with the DME Entity Enterprise.

284.    The Paper Owner Defendants and the Secret Owner knowingly have conducted and/or participated, directly or indirectly, in the conduct of the DME Entity Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the DME Entity Enterprise was not entitled to receive under the No-Fault Laws, because: (i) the bills submitted to GEICO for the provision Fraudulent Equipment were not based upon medical necessity but were instead submitted pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (ii) the

Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate; (iii) the Fraudulent Equipment was dispensed pursuant to decisions by laypersons who are not legally authorized to prescribe DME; (iv) to the extent the DME Entities actually provided any Fraudulent Equipment, the DME Entities each fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds; (v) to the extent the DME Entities actually provided any Fraudulent Equipment, the DME Entities fraudulently misrepresented that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the DME Entities failed to comply with local licensing requirements as they either failed to obtain a Dealer in Products license from the DCWP before they submitted billing or they knowingly falsified information on their applications for a Dealer in Products License. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" through "6".

285.    The DME Entity Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which the Paper Owner Defendants and Secret Owner operated the DME Entities, inasmuch as the DME Entities never operated as legitimate DME/OD providers, never were entitled to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the DME Entities to function. Furthermore, the intricate planning required to

carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through the DME Entities to the present day.

286.    The DME Entity Enterprise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the DME Entities Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-fault billing.

287.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1 million pursuant to the fraudulent bills submitted by Defendants through the DME Entity Enterprise.

288.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against the Paper Owner Defendants and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

289.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

290.    The DME Entity Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

291.    The Paper Owner Defendants and the John Doe Defendants are employed by and/or associated with the DME Entity Enterprise.

292.    The Paper Owner Defendants and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the

DME Entity Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the DME Entities were not entitled to receive under the No-Fault Laws because: (i) the bills submitted to GEICO for the provision Fraudulent Equipment were not based upon medical necessity but were instead submitted pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (ii) the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate; (iii) the Fraudulent Equipment was dispensed pursuant to decisions by laypersons who are not legally authorized to prescribe DME; (iv) to the extent the DME Entities actually provided any Fraudulent Equipment, the DME Entities each fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds; (v) to the extent the DME Entities actually provided any Fraudulent Equipment, the DME Entities fraudulently misrepresented that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the DME Entities failed to comply with local licensing requirements as they either failed to obtain a Dealer in Products license from the DCWP before they submitted billing or they knowingly falsified information on their applications for a Dealer in

Products License. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" through "6".

293.    The Paper Owner Defendants and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

294.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1 million pursuant to the fraudulent bills submitted by Defendants through the DME Entity Enterprise.

295.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against Pirozhenko, Alpine Supply, and the Secret Owner**
**(Common Law Fraud)**

296.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

297.    Pirozhenko, Alpine Supply, and the Secret Owner intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for Fraudulent Equipment.

298.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial

gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to GEICO; (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the representation that Alpine Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Alpine Supply was not lawfully licensed as they knowingly falsified the ownership information for Alpine Supply on their application for a Dealer in Products license.  A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

299.    Pirozhenko, Alpine Supply, and the Secret Owner intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Alpine Supply that were not compensable under New York No-Fault insurance laws.

300.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $82,000.00 pursuant to the fraudulent bills submitted by Defendants through Alpine Supply.

301.    Pirozhenko, Alpine Supply, and the Secret Owner's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

302.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against Pirozhenko, Alpine Supply, and the Secret Owner
### (Unjust Enrichment)

303.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

304.    As set forth above, Pirozhenko, Alpine Supply, and the Secret Owner have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

305.    When GEICO paid the bills and charges submitted by or on behalf of Alpine Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments

based on the improper, unlawful, and/or unjust acts of Pirozhenko, Alpine Supply, and the Secret Owner.

306.    Pirozhenko, Alpine Supply, and the Secret Owner have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Pirozhenko, Alpine Supply, and the Secret Owner voluntarily accepted notwithstanding their improper, unlawful and unjust billing scheme.

307.    Retention of GEICO's payments by Pirozhenko, Alpine Supply, and the Secret Owner violates fundamental principles of justice, equity, and good conscience.

308.    By reason of the above, Pirozhenko, Alpine Supply, and the Secret Owner, have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $82,000.00.

**SIXTH CAUSE OF ACTION**
**Against the John Doe Defendants**
**(Aiding and Abetting Fraud)**

309.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

310.    The John Doe Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Pirozhenko, Alpine Supply, and the Secret Owner.

311.    The acts of the John Doe Defendants in furtherance of the fraudulent scheme included, among other things, knowingly engaging in collusive arrangements with the Defendants for the procurement of medically unnecessary prescriptions for Fraudulent Equipment issued pursuant to a pre-determined protocol to maximize profits without regard to patient care and routing those prescriptions directly to Pirozhenko and Alpine Supply and bypassing the Insureds.

312.    The conduct of the John Doe Defendants in furtherance of the fraudulent scheme

was significant and material. The conduct of the John Doe Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Pirozhenko, Alpine Supply, and the Secret Owner to bill for Fraudulent Equipment and obtain payment from GEICO and other insurers.

313.    The John Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Pirozhenko, Alpine Supply, and the Secret Owner for medically unnecessary Fraudulent Equipment because they sought to continue profiting through the fraudulent scheme.

314.    The conduct of the John Doe Defendants caused GEICO to pay more than $82,000.00 pursuant to the fraudulent bills submitted through Alpine Supply.

315.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

316.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

## SEVENTH CAUSE OF ACTION
### Against Halchynski, GGR Supply, and the Secret Owner
### (Common Law Fraud)

317.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

318.    Halchynskyi, GGR Supply, and the Secret Owner intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for Fraudulent Equipment.

319. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to GEICO; (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the representation that GGR Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact GGR Supply was not lawfully licensed as they knowingly falsified the ownership information for GGR Supply on their application for a Dealer in Products

license.  A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

320.    Halchynskyi, GGR Supply, and the Secret Owner intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through GGR Supply that were not compensable under New York no-fault insurance laws.

321.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $175,000.00 pursuant to the fraudulent bills submitted by Defendants through GGR Supply.

322.    Halchynskyi, GGR Supply, and the Secret Owner's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

323.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against Halchynskyi, GGR Supply, and the Secret Owner
### (Unjust Enrichment)

324.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

325.    As set forth above, Halchynskyi, GGR Supply, and the Secret Owner have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

326.    When GEICO paid the bills and charges submitted by or on behalf of GGR SUPPLY for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of Halchynskyi, GGR Supply, and the Secret Owner.

327.    Halchynskyi, GGR Supply, and the Secret Owner have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Halchynskyi, GGR Supply, and the Secret Owner voluntarily accepted notwithstanding their improper, unlawful and unjust billing scheme.

328.    Retention of GEICO's payments by Halchynskyi, GGR Supply, and the Secret Owner violates fundamental principles of justice, equity, and good conscience.

329.    By reason of the above, Halchynskyi, GGR Supply, and the Secret Owner have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $175,000.00.

### NINTH CAUSE OF ACTION
**Against the John Doe Defendants**
**(Aiding and Abetting Fraud)**

330.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

331.    The John Doe Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Halchynskyi, GGR Supply, and the Secret Owner.

332.    The acts of the John Doe Defendants in furtherance of the fraudulent scheme included, among other things, knowingly engaging in collusive arrangements with the Defendants for the procurement of medically unnecessary prescriptions for Fraudulent Equipment issued pursuant to a pre-determined protocol to maximize profits without regard to patient care and

routing those prescriptions directly to Halchynskyi and GGR Supply, and bypassing the Insureds.

333.    The conduct of the John Doe Defendants in furtherance of the fraudulent scheme was significant and material.  The conduct of the John Doe Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Halchynskyi, GGR Supply, and the Secret Owner to bill for Fraudulent Equipment and obtain payment from GEICO and other insurers.

334.    The John Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Halchynskyi, GGR Supply, and the Secret Owner for medically unnecessary Fraudulent Equipment because they sought to continue profiting through the fraudulent scheme.

335.    The conduct of the John Doe Defendants caused GEICO to pay more than $1755,000.00 pursuant to the fraudulent bills submitted through GGR Supply.

336.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

337.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

**TENTH CAUSE OF ACTION**
**Against Piven, HGY Supply, and the Secret Owner**
**(Common Law Fraud)**

338.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

339.    Piven, HGY Supply, and the Secret Owner intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in

the course of their submission of hundreds of fraudulent bills seeking payment for Fraudulent Equipment.

340.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to GEICO; (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the representation that HGY Supply had a lawful Dealer in Products License and was

entitled to No-Fault Benefits when in fact HGY Supply was not lawfully licensed as they knowingly falsified the ownership information for HGY Supply on their application for a Dealer in Products license. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

341. Piven, HGY Supply, and the Secret Owner intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through HGY Supply that were not compensable under New York no-fault insurance laws.

342. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $120,000.00 pursuant to the fraudulent bills submitted by Defendants through HGY Supply.

343. Piven, HGY Supply, and the Secret Owner's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

344. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
### Against Piven, HGY Supply, and the Secret Owner
### (Unjust Enrichment)

345. GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

346.    As set forth above, Piven, HGY Supply, and the Secret Owner have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

347.    When GEICO paid the bills and charges submitted by or on behalf of HGY Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of Piven, HGY Supply, and the Secret Owner.

348.    Piven, HGY Supply, and the Secret Owner have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Piven, HGY Supply, and the Secret Owner voluntarily accepted notwithstanding their improper, unlawful and unjust billing scheme.

349.    Retention of GEICO's payments by Piven, HGY Supply, and the Secret Owner violates fundamental principles of justice, equity, and good conscience.

350.    By reason of the above Piven, HGY Supply, and the Secret Owner have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $120,000.00.

## TWELFTH CAUSE OF ACTION
### Against the John Doe Defendants
### (Aiding and Abetting Fraud)

351.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

352.    The John Doe Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Piven, HGY Supply, and the Secret Owner.

353.    The acts of the John Doe Defendants in furtherance of the fraudulent scheme included, among other things, knowingly engaging in collusive arrangements with the Defendants for the procurement of medically unnecessary prescriptions for Fraudulent Equipment issued pursuant to a pre-determined protocol to maximize profits without regard to patient care and

routing those prescriptions directly to Piven and HGY Supply and bypassing the Insureds.

354.    The conduct of the John Doe Defendants in furtherance of the fraudulent scheme was significant and material.  The conduct of the John Doe Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Piven, HGY Supply, and the Secret Owner to bill for Fraudulent Equipment and obtain payment from GEICO and other insurers.

355.    The John Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Piven, HGY Supply, and the Secret Owner for medically unnecessary Fraudulent Equipment because they sought to continue profiting through the fraudulent scheme.

356.    The conduct of the John Doe Defendants caused GEICO to pay more than $120,000.00 pursuant to the fraudulent bills submitted through HGY Supply.

357.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

358.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

### THIRTEENTH CAUSE OF ACTION
**Against Martniuk, Lense Supply, and the Secret Owner**
**(Common Law Fraud)**

359.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

360.    Martniuk, Lense Supply, and the Secret Owner intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from

GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for Fraudulent Equipment.

361.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to GEICO; (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the representation that Lense Supply had a lawful Dealer in Products License and was

104

entitled to No-Fault Benefits when in fact Lense Supply was not lawfully licensed as they knowingly falsified the ownership information for Lense Supply on their application for a Dealer in Products license. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

362.    Martniuk, Lense Supply, and the Secret Owner intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Lense Supply that were not compensable under New York no-fault insurance laws.

363.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $205,000.00 pursuant to the fraudulent bills submitted by Defendants through Lense Supply.

364.    Martniuk, Lense Supply, and the Secret Owner's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

365.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

## FOURTEENTH CAUSE OF ACTION
**Against Martniuk, Lense Supply, and the Secret Owner**
**(Unjust Enrichment)**

366.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

367.    As set forth above, Martniuk, Lense Supply, and the Secret Owner" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

368.    When GEICO paid the bills and charges submitted by or on behalf of Lense Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of Martniuk, Lense Supply, and the Secret Owner.

369.    Martniuk, Lense Supply, and the Secret Owner have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Martniuk, Lense Supply, and the Secret Owner voluntarily accepted notwithstanding their improper, unlawful and unjust billing scheme.

370.    Retention of GEICO's payments by Martniuk, Lense Supply, and the Secret Owner violates fundamental principles of justice, equity, and good conscience.

371.    By reason of the above Martniuk, Lense Supply, and the Secret Owner have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $205,000.00.

**<u>FIFTEENTH CAUSE OF ACTION</u>**
**Against the John Doe Defendants**
**(Aiding and Abetting Fraud)**

372.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

373.    The John Doe Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Martniuk, Lense Supply, and the Secret Owner.

374.    The acts of the John Doe Defendants in furtherance of the fraudulent scheme included, among other things, knowingly engaging in collusive arrangements with the Defendants

for the procurement of medically unnecessary prescriptions for Fraudulent Equipment issued pursuant to a pre-determined protocol to maximize profits without regard to patient care and routing those prescriptions directly to Martniuk and Lense Supply and bypassing the Insureds.

375.    The conduct of the John Doe Defendants in furtherance of the fraudulent scheme was significant and material.  The conduct of the John Doe Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Martniuk, Lense Supply, and the Secret Owner to bill for Fraudulent Equipment and obtain payment from GEICO and other insurers.

376.    The John Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Martniuk, Lense Supply, and the Secret Owner for medically unnecessary Fraudulent Equipment because they sought to continue profiting through the fraudulent scheme.

377.    The conduct of the John Doe Defendants caused GEICO to pay more than $205,000.00 pursuant to the fraudulent bills submitted through Lense Supply.

378.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

379.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

## SIXTEENTH CAUSE OF ACTION
### Against Kharitonov, Mazol Supply, and the Secret Owner
### (Common Law Fraud)

380.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

381.    Kharitonov, Mazol Supply, and the Secret Owner intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for Fraudulent Equipment.

382.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to GEICO; (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these

108

amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the representation that Mazol Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Mazol Supply was not lawfully licensed as they knowingly falsified the ownership information for Mazol Supply on their application for a Dealer in Products license. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

383. Kharitonov, Mazol Supply, and the Secret Owner intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Mazol Supply that were not compensable under New York no-fault insurance laws.

384. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $220,000.00 pursuant to the fraudulent bills submitted by Defendants through Mazol Supply.

385. Kharitonov, Mazol Supply, and the Secret Owner's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

386. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

## SEVENTEENTH CAUSE OF ACTION
### Against Kharitonov, Mazol Supply, and the Secret Owner
### (Unjust Enrichment)

387.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

388.    As set forth above, Kharitonov, Mazol Supply, and the Secret Owner have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

389.    When GEICO paid the bills and charges submitted by or on behalf of Mazol Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of Kharitonov, Mazol Supply, and the Secret Owner.

390.    Kharitonov, Mazol Supply, and the Secret Owner have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Kharitonov, Mazol Supply, and the Secret Owner voluntarily accepted notwithstanding their improper, unlawful and unjust billing scheme.

391.    Retention of GEICO's payments by Kharitonov, Mazol Supply, and the Secret Owner violates fundamental principles of justice, equity, and good conscience.

392.    By reason of the above, Kharitonov, Mazol Supply, and the Secret Owner have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $220,000.00.

### EIGHTEENTH CAUSE OF ACTION
**Against the John Doe Defendants**
**(Aiding and Abetting Fraud)**

393.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

394.    The John Doe Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Kharitonov, Mazol Supply, and the Secret Owner.

395.    The acts of the John Doe Defendants in furtherance of the fraudulent scheme included, among other things, knowingly engaging in collusive arrangements with the Defendants for the procurement of medically unnecessary prescriptions for Fraudulent Equipment issued pursuant to a pre-determined protocol to maximize profits without regard to patient care and routing those prescriptions directly to Kharitonov and Mazol Supply and bypassing the Insureds.

396.    The conduct of the John Doe Defendants in furtherance of the fraudulent scheme was significant and material.  The conduct of the John Doe Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Kharitonov, Mazol Supply, and the Secret Owner to bill for Fraudulent Equipment and obtain payment from GEICO and other insurers.

397.    The John Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Kharitonov, Mazol Supply, and the Secret Owner for medically unnecessary Fraudulent Equipment because they sought to continue profiting through the fraudulent scheme.

398.    The conduct of the John Doe Defendants caused GEICO to pay more than $220,000.00 pursuant to the fraudulent bills submitted through Mazol Supply.

399.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

400.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

**<u>NINETEENTH CAUSE OF ACTION</u>**
**Against Berdar, Polly Supply, and the Secret Owner**
**(Common Law Fraud)**

401.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

402.    Berdar, Polly Supply, and the Secret Owner intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for Fraudulent Equipment.

403.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes

billed to GEICO; (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the representation that Polly Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Polly Supply was not lawfully licensed as they knowingly falsified the ownership information for Polly Supply on their application for a Dealer in Products license.  A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6".

404.    Berdar, Polly Supply, and the Secret Owner intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Polly Supply that were not compensable under New York no-fault insurance laws.

405.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $250,000.00 pursuant to the fraudulent bills submitted by Defendants through Polly Supply.

406.    Berdar, Polly Supply, and the Secret Owner's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

407.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

### TWENTIETH CAUSE OF ACTION
### Against Berdar, Polly Supply, and the Secret Owner
### (Unjust Enrichment)

408.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

409.    As set forth above, Berdar, Polly Supply, and the Secret Owner have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

410.    When GEICO paid the bills and charges submitted by or on behalf of Polly Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of Berdar, Polly Supply, and the Secret Owner.

411.    Berdar, Polly Supply, and the Secret Owner have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Berdar, Polly Supply, and the Secret Owner voluntarily accepted notwithstanding their improper, unlawful and unjust billing scheme.

412.    Retention of GEICO's payments by Berdar, Polly Supply, and the Secret Owner violates fundamental principles of justice, equity, and good conscience.

413.    By reason of the above, Berdar, Polly Supply, and the Secret Owner have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $250,000.00.

### TWENTY-FIRST CAUSE OF ACTION
### Against the John Doe Defendants
### (Aiding and Abetting Fraud)

414.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

415.    The John Doe Defendants knowingly aided and abetted the fraudulent scheme that

was perpetrated on GEICO by Berdar, Polly Supply, and the Secret Owner.

416.    The acts of the John Doe Defendants in furtherance of the fraudulent scheme included, among other things, knowingly engaging in collusive arrangements with the Defendants for the procurement of medically unnecessary prescriptions for Fraudulent Equipment issued pursuant to a pre-determined protocol to maximize profits without regard to patient care and routing those prescriptions directly to Berdar and Polly Supply and bypassing the Insureds.

417.    The conduct of the John Doe Defendants in furtherance of the fraudulent scheme was significant and material.  The conduct of the John Doe Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Berdar, Polly Supply, and the Secret Owner to bill for Fraudulent Equipment and obtain payment from GEICO and other insurers.

418.    The John Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Berdar, Polly Supply, and the Secret Owner for medically unnecessary Fraudulent Equipment because they sought to continue profiting through the fraudulent scheme.

419.    The conduct of the John Doe Defendants caused GEICO to pay more than $250,000.00 pursuant to the fraudulent bills submitted through Polly Supply.

420.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

421.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

## **JURY DEMAND**

422.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgement be entered in their favor and against Defendants as follows:

A.    On the First Cause of Action against the DME Entities, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the DME Entities have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of action against the Paper Owner Defendants and the Secret Owner for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $1 million together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against the Paper Owner Defendants and the John Doe Defendants for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $1 million together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against Pirozhenko, Alpine Supply, and the Secret Owner for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $82,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.    On the Fifth Cause of Action against Pirozhenko, Alpine Supply, and the Secret Owner for more than $82,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $82,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Halchysnkyi, GGR Supply, and the Secret Owner for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $175,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

H.      On the Eighth Cause of Action against Halchysnkyi, GGR Supply, and the Secret Owner for more than $175,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

I.      On the Ninth Cause of Action against the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $175,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Piven, HGY Supply, and the Secret Owner for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $120,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K.      On the Eleventh Cause of Action against Piven, HGY Supply, and the Secret Owner for more than $120,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

L.      On the Twelfth Cause of Action against the John Doe Defendants, compensatory

damages in favor of GEICO in an amount to be determined at trial but in excess of $120,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against Martniuk, Lense Supply, and the Secret Owner for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $205,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

N.      On the Fourteenth Cause of Action against Martniuk, Lense Supply, and the Secret Owner for more than $205,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

O.      On the Fifteenth Cause of Action against the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $205,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

P.      On the Sixteenth Cause of Action against Kharitonov, Mazol Supply, and the Secret Owner for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $220,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Q.      On the Seventeenth Cause of Action against Kharitonov, Mazol Supply, and the Secret Owner for more than $220,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

R.      On the Eighteenth Cause of Action against the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $220,000.00

together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

S.      On the Nineteenth Cause of Action against Berdar, Polly Supply, and the Secret Owner for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $250,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

T.      On the Twentieth Cause of Action against, Berdar, Polly Supply, and the Secret Owner for more than $250,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

U.      On the Twenty-First Cause of Action against the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $220,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

Dated: January 30, 2026
      Uniondale, New York

                         RIVKIN RADLER LLP

                         By: */s/ Barry I. Levy*
                                Barry I. Levy, Esq.
                                Michael Vanunu, Esq.
                                Philip P. Nash, Esq.
                                Ashley N. Prinz, Esq.
                         926 RXR Plaza
                         Uniondale, New York 11556
                         (516) 357-3000

                         *Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*